**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 12, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MELVIN DUMMAR,

      Plaintiff - Appellant,

    v.

WILLIAM RICE LUMMIS; FRANK
W. GAY, II and ROBERT C. GAY, as
personal representatives of Frank
William Gay, deceased,

      Defendants - Appellees.

No. 07-4062

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 06-CV-66-BSJ)**

---

Stuart L. Stein, The Stein Law Firm, Albuquerque, New Mexico, for Plaintiff -
Appellant.

Randy L. Dryer (Gordon L. Roberts and James T. Blanch, with him on the briefs),
of Parsons, Behle & Latimer, Salt Lake City, Utah, for Defendant - Appellee
Lummis.

Peggy A. Tomsic (Eric K. Schnibbe, with her on the briefs), of Tomsic & Peck,
Salt Lake City, Utah, for Defendants - Appellees Gay.

---

Before **MURPHY**, **HARTZ**, and **GORSUCH**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

This case, like several before it (as well as a few books and an Academy Award winning film),[1] concerns the estate of the late billionaire Howard Hughes. Plaintiff Melvin Dummar has long maintained that he is entitled to a portion of the Hughes fortune, having been named an heir in a handwritten document (the Holographic Will) purporting to be Hughes's will. A Nevada jury found the Holographic Will invalid in 1978. But Mr. Dummar filed a new suit in the United States District Court for the District of Utah in 2006, alleging that Defendants William Rice Lummis and Frank William Gay deprived him of his inheritance by conspiring to cause the jury to reject the Holographic Will. His amended complaint (the Complaint) asserts four claims against Defendants: (1) fraud, (2) violation of the federal Racketeer Influenced and Corrupt Organization (RICO) statute, 18 U.S.C. §§ 1961-68, (3) violation of Nevada's RICO statute, Nev. Rev. Stat. §§ 207.350-.510, and (4) unjust enrichment. He contends that absent Defendants' wrongdoing, the jury would have found the will valid, and he would have inherited $156 million. For relief he requests $156 million, with interest dating back to 1978, treble damages, punitive damages, costs, and attorney fees.

---

[1]The books include Geoff Schumacher, Howard Hughes: Power, Paranoia, and Palace Intrigue (2008); Gary Magneson, The Investigation: A Former FBI Agent Uncovers the Truth Behind Howard Hughes, Melvin Dummar, and the Most Contested Will in American History (2005); and James R. Phelan & Lewis Chester, The Money: The Battle for Howard Hughes's Billions (1998). The movie is Melvin and Howard (Universal Pictures 1980).

The district court, ruling that Mr. Dummar's claims were barred by issue preclusion based on the 1978 judgment, dismissed the Complaint. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the dismissal. As we will explain, the fraud and federal RICO claims are each time-barred, the Nevada RICO claim fails to state a claim, and the unjust-enrichment claim is barred by issue preclusion.

## I.    BACKGROUND

### A.    The Complaint

The Complaint alleges the following facts:

Late in the evening, sometime during the last week of December 1967, Mr. Dummar was driving through rural Nevada. When he pulled off the road for a rest stop, he saw a bloodied and disheveled man lying in the road. Mr. Dummar woke the semiconscious man and offered to take him to a hospital. The man instead requested to be driven to the Sands Hotel in Las Vegas, Nevada. Mr. Dummar complied, and during the ride to Las Vegas the man identified himself as Howard Hughes. After leaving the man at the Sands Hotel, Mr. Dummar had no contact with him.

Hughes died in 1976. Shortly after Hughes's death, a stranger[2] delivered an envelope to Mr. Dummar at the gas station in Utah where he worked. The

---

[2]Before the probate trial the stranger was identified as LeVane Forsythe, a "confidential agent" of Hughes. J. App. at 17 (Compl. at ¶ 10).

-3-

envelope was addressed to the President of the Church of Jesus Christ of Latter Day Saints (the LDS Church). Steaming open the envelope, Mr. Dummar found inside a three-page, handwritten document purporting to be Hughes's last will and testament. The document listed him as a 1/16 beneficiary of Hughes's estate. Mr. Dummar delivered the envelope to the LDS Church, leaving it on a secretary's desk.

In April 1976 the LDS Church delivered the Holographic Will to the Clark County District Court in Las Vegas, Nevada, for probate. A trial ensued to determine the will's validity. Mr. Dummar was an in-court proponent of the will; several relatives of Hughes, including Defendant Lummis, opposed it. Although the Holographic Will named Mr. Lummis a 1/16th beneficiary, he stood to gain more from intestate succession. Defendant Gay, who was the Chief Operating Officer of the Hughes entities for the period surrounding Hughes's death, "worked together" with the opponents of the Holographic Will. J. App. at 15 (Compl. at ¶ 5). At trial Mr. Dummar testified about giving Hughes a ride; the opponents of the will, however, introduced testimony that for a period of years, including December 1967, Hughes never left his hotel. Each side presented testimony from a handwriting expert. On June 8, 1978, the jury rejected the Holographic Will.

Nearly 30 years later Mr. Dummar obtained information regarding misconduct related to the trial. He learned from a pilot that on various occasions

-4-

before December 1967, Hughes had flown to locations in southern Nevada to investigate sites for a terminal for supersonic jets and to visit brothels. The flights were arranged by Howard Eckersley, a close aide of Hughes and employee of Mr. Gay. During late December 1967 Eckersley had the pilot take Hughes to visit a prostitute at the Cottontail Ranch at Lida Junction in rural Nevada. While waiting for Hughes at the brothel, the pilot fell asleep; when he awoke, he was told that Hughes had left alone. The pilot then returned to Las Vegas without Hughes. Some months after this incident, he accepted an executive position with a company owned by a friend of Hughes. Before the pilot left, Eckersley ordered him to turn over his flight logs and company records so that all references to Hughes as his passenger could be removed. The pilot then signed a nondisclosure agreement, which he honored until recently.

In addition to the information from the former pilot, Mr. Dummar has learned (or perhaps only inferred—the Complaint often omits when the information was received and who the source was) the following:[3] (1) after the Holographic Will was delivered for probate, there was a meeting of aides close to Hughes in which it was decided that all would testify that Hughes never left the Desert Inn Hotel, where he lived, for years at a time; (2) Mr. Gay and Mr. Lummis bribed and threatened the aides to testify falsely; (3) top aides,

[3]We provide a complete list of Mr. Dummar's allegations of wrongdoing, although we are not able to determine the relevance of certain accusations to this action.

including Eckersley, did testify falsely that Hughes never left his hotel during the period in question; (4) Mr. Gay himself testified that there was a "possibility" that Hughes left the Desert Inn, but he denied any actual knowledge of such a departure; (5) high doses of codeine contributed to Hughes's death, and Defendants were "involved in" the destruction of boxes of empty codeine vials; (6) a member of the jury successfully campaigned to be elected foreperson by using typewritten notes that he claimed to have prepared at home from his handwritten trial notes, thus "irrevocably taint[ing]" the verdict, *id.* at 27 (Compl. at ¶ 33); (7) after the trial a reporter was threatened and warned not to interview this juror or investigate the reasons for the probate verdict; (8) there was a pattern of threats, including of bodily harm, against witnesses who were to testify for Dummar; (9) the opponents of the Holographic Will paid more than $100,000 for expert testimony on handwriting; and (10) it is "understood" that the jury foreperson had his debts at Hughes's casinos forgiven, *id.* at 31 (Compl. at ¶ 41).

## B.    District Court Proceedings

Mr. Gay and Mr. Lummis each filed a motion under Fed. R. Civ. P. 12(b)(6) to dismiss Mr. Dummar's Complaint.  They raised several grounds for dismissal, including issue preclusion arising from the probate judgment, time bar, and failure to state claims entitling Mr. Dummar to relief.  Mr. Dummar responded to both motions.  After a hearing the district court granted the motions on the ground of issue preclusion.  Mr. Dummar's motion for reconsideration was

denied.  He now appeals.  Defendants argue that the district court was correct to dismiss the claims on issue-preclusion grounds but argue alternatively that the dismissal can be affirmed on the other grounds that they raised in district court.

## II.    DISCUSSION

"We review the district court's grant of a Rule 12(b)(6) motion de novo, accepting all well-pleaded allegations as true and viewing them in the light most favorable to the plaintiff."  *Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007).  We may "affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court."  *Weitzel v. Div. of Occupational & Prof'l Licensing of Dep't of Commerce of Utah*, 240 F.3d 871, 876 (10th Cir. 2001) (internal quotation marks omitted).  We address each of Dummar's claims in turn:  fraud, federal civil RICO, Nevada civil RICO, and unjust enrichment.  Our choice of the ground on which to affirm says nothing about the merits of other possible grounds.

### A.    Fraud

Defendants argue that Mr. Dummar's claim for fraud is time-barred.  Neither party has suggested whether Utah or Nevada law should apply to the fraud claim, but we need not decide between them.  The laws of the two States are similar in all relevant respects, so the choice of law would not influence the outcome.

In Nevada,

> [F]raud must be proven by clear and convincing evidence as to each of the following elements:  (1) a false representation made by the defendant; (2) defendant's knowledge or belief that the representation is false (or insufficient basis for making the representation); (3) defendant's intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation; (4) plaintiff's justifiable reliance upon the misrepresentation; and (5) damage to the plaintiff resulting from such reliance.

*Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 957–58 (Nev. 1998).[4]  Utah's elements, though phrased differently, are in substance the same.  *See Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066–67 (Utah 1996).   In particular, each State requires a false representation, which, under Federal Rule of Civil Procedure 9(b), must be "state[ed] with particularity."  The only false representations alleged by the Complaint to have been made by either Defendant (or, rather, caused to have been made by Defendants) are the statements by Hughes's aides in depositions and at trial that Hughes never left his Las Vegas hotel during late December 1967.

A three-year limitations period applies to fraud claims in both Nevada and Utah.  *See* Nev. Rev. Stat. § 11.190(3)(d); Utah Code Ann. § 78B-2-305(3).  In

---

[4]Although *Bartgis* and other Nevada cases state that the defendant must have intended for the *plaintiff* to rely on the misrepresentation, Mr. Dummar points to one case, *Ries v. Olympian, Inc.*, 747 P.2d 910 (Nev. 1987), in which the court allowed a plaintiff to bring an action for fraud based on a *court's* reliance on a false representation.  We need not address Defendants' argument that this portion of *Ries* was dicta or is no longer good law in Nevada, because even if Nevada law applies, and even if Mr. Dummar may state a claim for fraud in Nevada based on the *jury's* reliance on the false statements, such a claim is barred by the statute of limitations for the reasons that we proceed to set forth.

both States the cause of action accrues upon "the discovery by the aggrieved party of the facts constituting the fraud." Nev. Rev. Stat § 11.190(3)(d); Utah Code Ann. § 78B-2-305(3). The question then is when Mr. Dummar discovered "the facts constituting the fraud." If the answer is apparent on the face of the complaint, this issue may be resolved on a motion to dismiss. *See Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 & n.4 (10th Cir. 1980); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

Defendants argue that Mr. Dummar discovered the facts constituting the fraud in 1978, when he heard the deposition and trial testimony. Mr. Dummar, in contrast, contends that discovery did not occur until he learned of the existence of the pilot, less than three years before filing the Complaint. Before then, he asserts, it was not "clear" that Defendants had committed fraud at the probate trial. Aplt. Reply Br. at 9. Mr. Dummar does not explain why the fraud became clear only when he learned of the pilot, but we will address the two possibilities that come to mind.

First, Mr. Dummar may be suggesting, as he did before the district court, that he did not know that the man in the desert was Hughes until the pilot provided him with confirmation of the man's identity. But even the pilot's account was not uncontrovertible evidence—why believe the pilot but not the man in the desert? "Discovery" in this context cannot mean possessing greater certainty than one ordinarily needs to take important action, such as initiating

litigation. Before learning of the pilot, Mr. Dummar not only had the word of the man in the desert but also the appearance of the Holographic Will eight years later. If the man in the desert was not Hughes, then Mr. Dummar's account of Hughes's agent showing up at Mr. Dummar's gas station several weeks after Hughes's death with a handwritten will bequeathing him millions of dollars would make not the slightest sense. So certain was Mr. Dummar that the man was Hughes that he was an in-court proponent of the Holographic Will during a lengthy probate trial. Accepting the Complaint's allegations as true, it is apparent that by 1978 Mr. Dummar had "discovered" the falsity of any statement that Hughes had never left his Las Vegas hotel during late December 1967.

Second, Mr. Dummar may be suggesting that he did not discover "the facts constituting the fraud" until he learned from the pilot that Hughes's aide Eckersley had arranged Hughes's flight to the Cottontail Ranch, because it was only then that Mr. Dummar knew that someone (specifically, Eckersley) had *knowingly* made false statements. But, as explained above, Mr. Dummar had discovered that those statements were false by the time of the probate trial; also, he knew that Eckersley was testifying about something that Eckersley claimed to have personal knowledge of. If more conclusive evidence of fraudulent intent were required before the statute began to run, then many a fraud claim would be subject to no time limitation at all. As the Alaska Supreme Court has recognized,

> Evidence of scienter is usually circumstantial, and a defrauded victim will normally have only indicia of scienter before suing.  Notice of the scienter element could not require knowledge of conclusive evidence, because conclusive evidence of scienter is rarely available, even through exercise of discovery.  If that level of notice were required, the limitations period for fraud would never begin running.

*City of Fairbanks v. Amoco Chem. Co.*, 952 P.2d 1173, 1179 (Alaska 1998).  That Mr. Dummar did not have additional proof of Eckersley's intent does not mean that he still needed to "discover" it.  The facts alleged in the Complaint demonstrate that in 1978 Mr. Dummar had all the knowledge necessary to start the limitations period running against him.  Dismissal of his fraud claim was appropriate.

## B.    Federal Civil RICO

Defendants argue that we should affirm the dismissal of Mr. Dummar's federal civil RICO claim because, among other reasons, it fails to state a claim and is time-barred.  Mr. Dummar has not responded on appeal to their argument that he has not pleaded essential elements of a RICO claim.  Perhaps we could affirm based on this failure to respond.  *Cf. Utah ex rel. Div. of Foresty, Fire & State Lands v. United States*, 528 F.3d 712, 724 (10th Cir. 2008) (failure to challenge alternative holding of district court constitutes waiver).  But we choose instead to dispose of the claim because it is time-barred—an argument that Mr. Dummar did, at least nominally, address.

To bring a civil RICO claim, a plaintiff must allege that he was "injured in his business or property" by the RICO violation. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). A RICO violation requires: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* (footnote omitted). A pattern of racketeering activity requires at least two acts of racketeering activity. *See* 18 U.S.C. § 1961(5). The RICO statute lists a number of crimes that constitute racketeering activity. *See id.* § 1961(1).

The Supreme Court has held that a civil federal RICO action is subject to a four-year limitations period. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). Although the Court

> has not settled upon a definitive rule for when the limitations clock
> starts running, it has announced two possibilities: either when the
> plaintiff knew or should have known of his injury (the
> injury-discovery rule); or when the plaintiff was injured, whether he
> was aware of the injury or not (the injury-occurrence rule).

*Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1234 (10th Cir. 2006). In either case the plaintiff need not be aware of the pattern of racketeering activity. *See Rotella v. Wood*, 528 U.S. 549, 553–54 (2000); *id.* at 555 (even if a discovery accrual rule applies, "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock"). It is unnecessary for us to choose between the two rules today, because it cannot be disputed that Mr. Dummar's injury and his discovery of that injury occurred simultaneously, when the jury returned its

-12-

verdict that the Holographic Will was invalid.  The limitations period therefore began running against him in 1978.

Mr. Dummar asserts, however, that "[o]n federal causes of action, fraudulent concealment is read into every statute of limitations."  Aplt. Reply Br. at 8.  From this we gather that he means to argue, as he did before the district court, that the limitations period should be tolled because of fraudulent concealment of the alleged RICO activity.  The Supreme Court has recognized that equitable tolling may be available under RICO, *see Rotella*, 528 U.S. at 560–61, and we have stated that a RICO cause of action can be tolled by fraudulent concealment when the plaintiff establishes

> (1) the use of fraudulent means by the party who raises the ban of the statute; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action.

*Ballen v. Prudential Bache Sec., Inc.*, 23 F.3d 335, 337 (10th Cir. 1994) (internal quotation marks omitted).  Allegations of fraudulent concealment, like other types of fraud, must be pleaded with particularity.  *See Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007).

Mr. Dummar has made no attempt on appeal to show that he pleaded the elements of fraudulent concealment.  At any rate, such an attempt would be futile.  To begin with, he has not adequately alleged "successful concealment from [Mr. Dummar]" of an element of his cause of action.  The Complaint lists three

acts alleged to support equitable tolling: (1) the "actual perjury and misleading testimony" of Hughes's aides, (2) the "destruction of evidence in the flight logs of the specific flights" taken by Hughes and the pilot in December 1967, and (3) the "ongoing understanding of the employees of the Hughes entities . . . of the enforceability of the non-disclosure agreements." J. App. at 31 (Compl. at ¶ 42). None of these is a sufficient allegation of fraudulent concealment. First, as explained in the above discussion of the fraud claim, Mr. Dummar had enough information concerning the perjury to begin the limitations period at the time of the probate trial; the perjury may have misled the jury, but not him. (We might add that tampering with witnesses in a state-court proceeding is not racketeering activity under the federal RICO statute. *See Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003)). Second, the alteration of the flight logs (alleged to have occurred nearly ten years before the probate trial) did not prevent Mr. Dummar from discovering the falsity of testimony that Hughes had never left his hotel in December 1967. The alteration may have concealed evidence corroborating Mr. Dummar's testimony (such as the information later provided by the pilot), but it did not prevent him from knowing any element of his RICO claim. Third, we fail to see what is fraudulent about an employer requiring employees to sign nondisclosure agreements. Mr. Dummar does not allege that the agreements required anyone to make misrepresentations of any sort, let alone lie under oath.

-14-

Even if we were also to consider allegations of wrongdoing not specifically referred to in the Complaint as fraudulent concealment, we would not find anything adequately alleging fraudulent concealment. Paragraph 22 of the Complaint alleges that Defendants ordered, bribed, and coerced Hughes's aides to commit perjury. This allegation supports an element of the RICO claim—namely, that Defendants bore responsibility for the perjury and other misconduct in the probate proceedings. But there is no allegation in the Complaint, or suggestion elsewhere in the record, that Mr. Dummar acquired any specific evidence of this misconduct during the four years before filing the Complaint. On the contrary, the allegations in paragraph 22 appear to be merely inferences by Mr. Dummar. Paragraph 19 of the Complaint states that "based upon their positions of control in [Hughes's enterprises], their personal involvement in the litigation and trial, as well as their personal motives and other facts alleged [in the Complaint], Plaintiff reasonably believes and alleges that Defendants . . . knew of and coordinated [the aides'] false testimony." J. App. at 20. We question whether the allegations of paragraph 22 are pleaded with sufficient particularity to support a claim of fraudulent concealment; but in any event, the absence of an allegation regarding how and when Mr. Dummar learned of the alleged misconduct forecloses a claim that Defendants' fraudulent concealment prevented Mr. Dummar from discovering Defendants' involvement until at least 2002—four years before filing suit. If the

-15-

allegations in the paragraph are based on information acquired only in recent years, the Complaint needed to assert that.

We also note that paragraph 18 of the Complaint alleges that shortly after Hughes's death, a meeting of his aides took place at which they decided that all would testify that Hughes never left his hotel during the relevant time period. Affidavits submitted by Mr. Dummar suggest that he learned of this meeting within four years of filing the Complaint. But neither the Complaint nor the affidavits say anything about Defendants' presence at, or other involvement with, that meeting. Again, Mr. Dummar has failed to explain why he could not have inferred Defendants' involvement in the perjury until more than 26 years after the probate trial.

Not only has Mr. Dummar not alleged the concealment necessary to satisfy the second element of a claim of fraudulent concealment, but he has also not alleged the due diligence necessary to satisfy the third element. *See Ballen*, 23 F.3d at 337; *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–96 (1997). The Complaint is completely silent as to any efforts that Mr. Dummar made to uncover his cause of action during the first 26 years after the probate trial.

Mr. Dummar did not show entitlement to equitable tolling, and his claim is therefore barred by the civil RICO limitations period. Dismissal of this claim was proper.

## C.     Nevada Civil RICO

Mr. Dummar claims that Defendants are liable for his damages under Nevada's civil RICO statute.  *See* Nev. Rev. Stat. § 207.470 (civil damages provision).  He alleges that they engaged in three predicate offenses: extortion, perjury or subornation of perjury, and offering false evidence—all of which allegedly occurred before, during, or immediately after the 1978 probate trial.  But Nevada's RICO statute was enacted in 1983 and requires that at least one of the predicate offenses have occurred after July 1, 1983:  "'Racketeering activity' means engaging in at least two crimes related to racketeering . . . if at least one of the incidents occurred after July 1, 1983 . . . ."  *Id.* § 207.390.  Consequently, the Complaint fails to state a cause of action under the Nevada RICO statute.

## D.     Unjust Enrichment

Finally, Mr. Dummar asserts a claim of unjust enrichment against Defendants.  Both Utah and Nevada require a plaintiff alleging unjust enrichment to demonstrate three elements:

> First, there must be a benefit conferred on one person by another.  Second, the conferee must appreciate or have knowledge of the benefit.  Finally, there must be the acceptance or retention by the conferee of the benefit under such circumstances *as to make it inequitable for the conferee to retain the benefit* without payment of its value.

*Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580, 582 (Utah 2000) (citations and internal quotation marks omitted) (emphasis added); *UnionAmerica Mortgage*

*& Equity Trust v. McDonald*, 626 P.2d 1272, 1273–74 (Nev. 1981) (same elements).

Mr. Dummar's theory is that Defendants were unjustly enriched when their actions deprived him of his "rightful inheritance." J. App. at 28 (Compl. at ¶ 36). But if Hughes truly died intestate, as the probate jury found, then it was not inequitable for Defendants to retain the benefit they received from the Hughes estate, and their enrichment was not *unjust*. The issue before us, therefore, is whether the probate jury's finding has preclusive effect in this case.

Federal courts are required to give the same preclusive effect to state-court judgments as the originating state itself would give. *See* 28 U.S.C. § 1738; *Allen v. McCurry*, 449 U.S. 90, 96 (1980). We therefore look to Nevada law to determine whether the probate judgment precludes Mr. Dummar from litigating the validity of the Holographic Will. In Nevada a party is barred from litigating an issue previously litigated when three conditions are met:

> (1) the issue decided in the prior litigation must be identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; and (3) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation.

*State, Univ. & Cmty. Coll. Sys. v. Sutton*, 103 P.3d 8, 16 (Nev. 2004) (internal quotation marks omitted).

The second and third elements are not in dispute. Mr. Dummar was a party to the probate proceeding, and that proceeding resulted in a definitive ruling on

the validity of the Holographic Will and Hughes's intestacy. Mr. Dummar claims, however, that the first element—the requirement of identical issues—is not met because the issue decided in the probate case, the validity of the Holographic Will, is not an issue in his current action. He asserts that he is attempting in this action to establish not that the will was valid but, rather, that Defendants' actions caused the jury to find that the will was invalid. This argument may have some merit with respect to Mr. Dummar's other causes of action, but it is wholly unpersuasive with respect to his unjust-enrichment claim. Defendants were unjustly enriched only if the Holographic Will was authentic, and the invalidity of that will was precisely the issue determined in the probate case. The district court was correct to give that judgment preclusive effect with respect to this claim.

## III. CONCLUSION

The judgment of the district court is AFFIRMED. Defendants' motion for sanctions is DENIED. Mr. Dummar's motion to dismiss the appeal and remand for additional trial proceedings is DENIED. Finally, we see nothing improper in the representations of the Gays to this court in their motion for substitution, so Mr. Dummar's motions to strike the joint brief and oral argument of Defendants and for a stay are DENIED. Mr. Dummar's motion for extension of time to reply to Defendants' supplement to their response is GRANTED. Mr. Dummar's reply shall be filed as of the date received, July 14, 2008.