In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2781

JAY E. HAYDEN FOUNDATION, *et al.*,

*Plaintiffs-Appellants*,

*v.*

FIRST NEIGHBOR BANK, N.A., *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:08-CV-00325-MJR-PMF—**Michael J. Reagan**, *Judge*.

ARGUED MARCH 30, 2010—DECIDED JUNE 22, 2010

Before POSNER, ROVNER, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. A foundation created by Jay Hayden, and the estates of his mother and of another woman (R. Maurine Johnson), brought this RICO suit against a bank, two law firms, and seven persons connected with either the bank or the law firms. The suit charges that the defendants (along with others not named as defendants, in particular Robert Cochonour) had formed an informal RICO enterprise that had defrauded the foundation and the estates. Without waiting

to file an answer to the complaint, the defendants moved to dismiss the suit pursuant to Rule 12(b)(6), on the ground that the complaint itself showed that the plaintiffs had missed the four-year deadline governing RICO suits. *Rotella v. Wood*, 528 U.S. 549, 552-53 (2000); *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987); *Cancer Foundation, Inc. v. Cerberus Capital Management, LP*, 559 F.3d 671, 674 (7th Cir. 2009). The district judge agreed and granted the motion. Although the statute of limitations is an affirmative defense to liability and so ordinarily must be pleaded and proved by the defendant, if it is plain from the complaint that the defense is indeed a bar to the suit dismissal is proper without further pleading. *Jones v. Bock*, 549 U.S. 199, 214-15 (2007); *Cancer Foundation, Inc. v. Cerberus Capital Management, LP, supra*, 559 F.3d at 674-75; *Limestone Development Corp. v. Village of Lemont*, 520 F.3d 797, 802 (7th Cir. 2008).

The complaint alleges that the fraud began, and the RICO enterprise (if that is what it is) came into existence, in 1985, when the plaintiff foundation was created by Hayden's will. But the plaintiffs argue that although they were reasonably diligent they didn't discover the fraud before May 5, 2004, four years before they filed suit; and that even if that argument is rejected and a finding made that they did discover it before then, the defendants prevented them from obtaining information essential to their being able to file a complaint that would withstand dismissal.

Our only source of facts is the 252 paragraphs of the second amended complaint, which sprawl over 66 pages.

For purposes of the appeal we assume the facts alleged in the complaint to be true, though without vouching for their truth.

Hayden's will had appointed the lawyer Robert Cochonour, afterward an Illinois state-court judge, to be the executor of his estate. Between becoming executor in 1985 upon the death of Hayden, and 2001, Cochonour looted the Hayden Foundation and the two women (who were still alive during that period, but very elderly) by forging endorsements and signatures on checks, on security agreements, and on other financial documents and by writing checks drawn on the foundation to himself or to entities that he controlled. He funneled the looted money through an account in the defendant bank, which was in cahoots with him, called the "M&M account," which he had opened by forging the signatures of Mrs. Johnson and of another woman, who later became Mrs. Johnson's agent. The defendants assisted Cochonour's fraud by allowing him to forge signatures and convert funds that they knew didn't belong to him and by preparing false documents that facilitated the transfer of funds to him from the Hayden foundation and the two old women.

The fraud began to unravel in 2002. It was then that Cochonour acknowledged to Maurine Johnson's agent (who had a power of attorney because Mrs. Johnson had become incompetent) that he had stolen money from Mrs. Johnson, though he lied about the amount he had stolen; and it was also then that her agent learned from someone associated with the bank about the

existence of the bank account through which stolen funds had been channeled. The trustees of the Hayden Foundation became suspicious around the same time when they learned that Cochonour had arranged for a court hearing to approve annual reports of the estate for the years 1986 to 2001; although he administered the foundation's affairs, he had never filed a financial report with the trustees. The trustees filed a complaint with the Illinois judicial inquiry board and notified the state's attorney general of their concerns, and the attorney general filed a petition in an Illinois state court to intervene in the Jay Hayden estate, which had never been closed. The petition was granted and Cochonour immediately resigned his judgeship. By this time the trustees knew that the foundation, though believed to have had more than $1 million in assets when it was created on Jay Hayden's death in 1985, now had no assets at all, and there was no record of what had happened to the money.

All this was in 2002. In January of the following year Cochonour pleaded guilty to having stolen more than $100,000 from the Jay Hayden estate between 1985 and 1990, and was sentenced to prison. Also well before May 5, 2004 (four years, remember, before this suit was filed), employees of the defendant bank tried to persuade one of the foundation's trustees to get the trustees to drop their inquiry into Cochonour. They told the trustee that all the irregularities could be explained, and that in any event, because a close confidant of Cochonour had become the subject of grand jury proceedings for stealing from an elderly person, Cumber-

land County (the site of the fraud) didn't need more bad publicity. A cousin of Jay Hayden hired a lawyer who told the cousin that he believed there was a conspiracy between Cochonour and the defendants.

Yet besides alleging all these things and more, the complaint also alleges that the defendants made assiduous efforts to prevent the plaintiffs from learning more about the conspiracy. They tried to convince Mrs. Johnson's agent not to investigate Cochonour and they filed complaints against the lawyer who had been retained by Jay Hayden's cousin to investigate the defendants. At the behest of the defendants the Illinois Attorney Registration & Disciplinary Commission told the lawyer to leave the state forthwith, as otherwise the commission would reopen investigations of him that had opened but not pursued to completion. And Cochonour in the legal proceedings against him tried to hide behind the Fifth Amendment, refusing to come clean about his activities, and when his stonewalling failed he defied court orders and was held in contempt. See *Estate of Hayden*, 838 N.E.2d 93 (Ill. App. 2005).

A defendant who prevents a plaintiff from obtaining information that he needs in order to be able to file a complaint that will withstand dismissal is forbidden, under the rubric of equitable estoppel ("estopped" is the legal term), to plead the statute of limitations for the period in which the inquiry was thwarted. *Beckel v. Wal-Mart Associates, Inc.*, 301 F.3d 621, 622 (7th Cir. 2002); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-52 (7th Cir. 1990); see also *Rotella v. Wood*, *supra*, 528 U.S. at 561. But

if the obstructive behavior occurs *after* the plaintiff's inquiry has reached the point at which he has discovered, or by exercising reasonable diligence should have discovered, that he has a claim upon which to found a suit, the defendant's obstructionism has no causal significance, see *Flight Attendants Against UAL Offset v. Commissioner*, 165 F.3d 572, 576-77 (7th Cir. 1999), and so is not a ground for an estoppel. *Paige v. Police Department*, 264 F.3d 197, 199-200 (2d Cir. 2001) (per curiam). Likewise if the defendant's behavior, whenever begun and however ill intentioned, fails to prevent the plaintiff from learning that he has a claim in time to sue within the statutory period. See *Flight Attendants Against UAL Offset v. Commissioner*, *supra*, 165 F.3d at 577; *Dummar v. Lummis*, 543 F.3d 614, 621-23 (10th Cir. 2008); cf. *Shropshear v. Corporation Counsel of City of Chicago*, 275 F.3d 593, 597-98 (7th Cir. 2001). For again the behavior has no causal significance.

We have said (not inconsistently with the qualifications just indicated) that "the plaintiff's lack of due diligence is not a defense [to a claim of equitable estoppel], because the defendant's conduct is deliberate, just as a plaintiff's contributory negligence is not a defense to an intentional tort." *Id.* at 597; see also *Flight Attendants Against UAL Offset v. Commissioner*, *supra*, 165 F.3d at 577. Not all courts agree, see, e.g., *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 425 (6th Cir. 2009); *Robinson v. Dalton*, 107 F.3d 1018, 1023 (3d Cir. 1997), and—more to the point—the Supreme Court has held that when an event occurs that tolls the statute of limitations in either a RICO or an

antitrust case, even if the event is fraud by the defendant, the plaintiff cannot fold his hands, sit back, and do nothing until the defendant returns to good behavior. He has to continue investigating diligently, to the extent he can despite the defendants' obstructionism, because the RICO and antitrust statutes seek not merely to protect private rights but also to enlist private plaintiffs in enforcing these laws, which are believed to serve important public purposes. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 193-96 (1997); see also *In re Copper Antitrust Litigation*, 436 F.3d 782, 790-91 (7th Cir. 2006); *Prudential Ins. Co. v. United States Gypsum Co.*, 359 F.3d 226, 237-38 (3d Cir. 2004).

Most of the frauds alleged in this case date back to the period 1985 to 1994, which was 14 to 23 years before the suit was filed. By the summer of 2003 at the latest, despite (and in part because of) the defendants' obstructive behavior, the plaintiffs knew that Cochonour had looted the Jay Hayden estate and that the bank's employees were trying to prevent further investigation of Cochonour, on implausible, suspicion-arousing grounds—that everything would be explained in due course and that further exposure of skullduggery would injure Cumberland County's good name.

If the plaintiffs didn't yet have enough information to be able to sue, they did by 2005, when Cochonour was deposed and made (in the words of the complaint) "detailed exhaustive admissions of repeated forgeries and thefts involving the M&M account and the Estate of Jay E. Hayden and the fact that all annual reports sub-

mitted . . . in February 2002 to the Trustees were false and misleading." And while Cochonour "continued to assert that all such actions were done by him alone," the plaintiffs knew better and so knew enough to sue his accomplices despite his and their continued stone-walling. Cf. *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 373 (7th Cir. 2001); *Paige v. Police Department*, *supra*, 264 F.3d at 199-200.

The plaintiffs mistakenly contend that a limitations period does not begin to run until the precomplaint investigation is complete, which may not have been until 2005, three years before they sued. Actually it starts running when the prospective plaintiff discovers (or should if diligent have discovered) both the injury that gives rise to his claim and the injurer or (in this case) injurers. See *United States v. Kubrick,* 444 U.S. 111, 123-24 (1979), and *United States v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010), and with specific reference to the RICO limitations period *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Commission*, 377 F.3d 682, 688 (7th Cir. 2004); *Prudential Ins. Co. v. United States Gypsum Co.*, *supra*, 359 F.3d at 233, and *Pincay v. Andrews*, 238 F.3d 1106, 1108-09 and n. 3 (9th Cir. 2001). The plaintiffs had discovered or should have discovered these things by the summer of 2003. Armed with the information obtained by then they should have been able to complete well within the four-year statutory period an investigation that would have unearthed enough facts to enable them to file a suit that would withstand dismissal. See *United States v. Kubrick, supra*, 444 U.S. at 122; *Lukovsky v. City & County of San Francisco*, 535 F.3d 1044, 1049-51 (9th Cir.

2008); *Wastak v. Lehigh Valley Health Network*, 342 F.3d 281, 287-88 and n. 2 (3d Cir. 2003). They could then have used pretrial discovery to beef up their claim. A plaintiff is not required to have collected, *before* he files suit, *all* the evidence he needs in order to win the suit. Otherwise the civil procedure rules would have to authorize precomplaint discovery rather than just pretrial discovery.

In the case of suits under RICO, as *Barry Aviation* and the other cases cited above explain, the injury arising from the first predicate act to injure the plaintiff ("predicate acts" are the illegal acts committed by the racketeering enterprise) starts the limitations period running, rather than the injury from the last predicate act, which might occur decades after the first, *Rotella v. Wood*, *supra*, 528 U.S. at 554; *Klehr v. A.O. Smith Corp.*, *supra*, 521 U.S. at 186-91. And the victim doesn't have to know he's been injured by a *RICO* violation, which is to say by a *pattern* of racketeering activity (that is, a series of predicate acts). *Rotella v. Wood*, *supra*, 528 U.S. at 554. The scope and nature of his legal claims are what he has four years to discover, or more (through invocation of tolling doctrines) if he really needs it. For remember that it's the discovery of the injury (and injurer), not of the facts that establish a particular legal theory, that starts the limitations period running; the limitations period is the time allowed to the plaintiff for determining the specific violation upon which to base a suit. That at least is the general rule, though there are exceptions; the limitations period in the Securities Exchange Act of 1934, for example, doesn't begin to run until the plaintiff

discovers "the facts constituting the violation." 28 U.S.C. § 1658(b)(1); see *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1796-97 (2010). But RICO requires discovery only of the injury and the injurer.

We said that the defendants' obstructive behavior may have prevented the plaintiffs from obtaining enough information before 2005 to know they'd sustained a legal injury and by whom it had been inflicted. But that did not automatically give them four more years to sue. Tolling doctrines need not extend the date on which the statute of limitations begins to run; for as soon as the tolling events cease—in a case of equitable estoppel, as soon as the defendants' obstructive behavior ceases—the plaintiffs should get to work and file suit as soon as is practicable, in order to minimize the inroads that dilatory filing makes into the policies served by statutes of limitations.

Certainly this is true with regard to equitable tolling, where, through no fault of the defendant (unlike equitable estoppel), the plaintiff has though diligent been unable to discover the injury or injurer within the statutory period. But there is a division of authority over whether the rule should be the same when the basis of tolling is the defendant's misconduct, giving rise to equitable estoppel. As we pointed out in *Gaiman v. McFarlane*, 360 F.3d 644, 656 (7th Cir. 2004), some cases hold that even in that case the plaintiff "must sue as soon as it is feasible to do so," while "other [cases], distinguishing equitable estoppel, where the defendant is responsible for the plaintiff's delay, from equitable

tolling, where he is not, hold that in the former case though not the latter the plaintiff can subtract the entire period of the delay induced by the defendant, or in other words can extend the statutory period by the full amount of the delay," and "at least one case [*Buttry v. General Signal Corp.,* 68 F.3d 1488, 1494 (2d Cir. 1995)] takes a middle position: the plaintiff is *presumptively* entitled to subtract the entire period" (emphasis in original).

In a RICO case, given the Supreme Court's emphasis noted earlier on the importance of prompt suit to achieve the statute's public purposes, the plaintiff should not be entitled to an automatic extension of the statute of limitations by the length of the period of concealment by the defendants. The injury on which the present suit is based occurred many years before the statute of limitations would have run had it not been for that concealment, for otherwise the plaintiffs would have discovered the fraud; and it is discovery that starts the limitations period running. To litigate a claim so long after the events giving rise to it is bound to be difficult because of lost evidence and faded memories, and the difficulty would be needlessly augmented had the plaintiff no duty of alacrity once the facts that the defendants had improperly concealed are at last in the open. By 2005 the plaintiffs knew *so* much that they did not need three more years to complete their precomplaint investigation and file suit.

And so their suit is indeed time-barred. But for the sake of completeness we take up the defendants' alternative argument that the complaint fails to allege a RICO

violation because the allegations show there was no RICO enterprise.

Until recently we would have said that conspiracy to commit a predicate act is a different animal from a RICO enterprise. E.g., *Stachon v. United Consumer Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000); *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991). We would have explained that while RICO enterprises, being illegal, often lack the structure of a legal enterprise, such as a corporation or a public agency (but not always—a RICO enterprise can be a conventional enterprise that has been taken over by crooks, e.g., *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 160-62 (2001); *United States v. Goot*, 894 F.2d 231, 239 (7th Cir. 1990); *United States v. Kovic*, 684 F.2d 512, 516 (7th Cir. 1982); *Landry v. Air Line Pilots Ass'n Int'l, AFL-CIO*, 901 F.2d 404, 434 (5th Cir. 1990)), and so are often hard to distinguish from conspiracies, the distinction is essential—otherwise the requirement of proving an enterprise and not merely a conspiracy would be read out of the statute. And in this case we have *just* a conspiracy, between a judge-executor, lawyers, and a bank and its officers, rather than anything that looks even remotely like an enterprise, however informal; for there was no structure, organization, or leadership. *Limestone Development Corp. v. Village of Lemont*, *supra*, 520 F.3d at 804-05; *Stachon v. United Consumers Club, Inc.*, *supra*, 229 F.3d at 675; *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990) (a RICO "enterprise" requires proof of "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual

decision-making"); *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994); *Old Time Enterprises, Inc. v. International Coffee Corp.*, 862 F.2d 1213, 1217 (5th Cir. 1989).

But the Supreme Court's recent decision in *Boyle v. United States*, 129 S. Ct. 2237 (2009), throws all in doubt. All that *Boyle* requires of a RICO enterprise is that it have "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. at 2244; see also *Rao v. BP Products North America, Inc.*, 589 F.3d 389, 399-400 (7th Cir. 2009); *United States v. Hutchinson*, 573 F.3d 1011, 1019-22 (10th Cir. 2009). The only difference the Court suggested between such a minimal RICO enterprise and a conspiracy is that conspiracy "is an inchoate crime that may be completed in the brief period needed for the formation of the agreement and the commission of a single overt act in furtherance of the conspiracy." 129 S. Ct. at 2246. Well, the alleged enterprise in this case had purpose and relationships and it certainly had "longevity," and if *Boyle* is taken at face value nothing more is required to make a conspiracy a RICO enterprise.

Even so, the RICO offense is *using* an enterprise to engage in a pattern of racketeering activity. 18 U.S.C. § 1962(c); *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) ("liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs" (emphasis in original)); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226-27 (7th Cir. 1997); *Walter v. Drayson*, 538 F.3d 1244, 1247-48 (9th

Cir. 2008). That element is conspicuous by its absence from this case. Conceivably the defendants who were officers of the bank that is alleged to have assisted Cochonour in his fraud were using the bank (an enterprise) to commit fraud—but that is not alleged. The enterprise alleged is the conspiracy led by Cochonour, who was not using an entity separate from himself (as the bank officers were), for he was the leading conspirator—yet he is not even a defendant. A bank could be accused of fraud without also being accused of conducting itself through a pattern of racketeering activity. The defendants did not use the conspiracy (the enterprise); they were the conspiracy.

The suit was properly dismissed.

AFFIRMED.