## In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-2977

UNITED FOOD AND COMMERCIAL
WORKERS UNIONS AND EMPLOYERS
MIDWEST HEALTH BENEFITS FUND,
individually and on behalf of all
others similarly situated,

*Plaintiffs-Appellants*,

*v.*

WALGREEN CO., PAR
PHARMACEUTICAL COS., INC., and
PAR PHARMACEUTICAL, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 12 C 204—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED JANUARY 24, 2013—DECIDED JULY 8, 2013

Before MANION and WOOD, *Circuit Judges*, and BARKER,
*District Judge.**

---

* The Honorable Sarah Evans Barker, United States District
Court for the Southern District of Indiana, sitting by designation.

WOOD, *Circuit Judge.* The United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund (the Fund), an employee benefit plan that provides healthcare benefits to its participants, is convinced that the Walgreen Company (Walgreens) fraudulently overcharged it and other insurance providers by filling prescriptions for several generic drugs with a dosage form that differed from, and was more expensive than, the dosage form prescribed to the customer. The Fund filed suit against Walgreens, as well as Par Pharmaceutical Companies and Par Pharmaceutical, Inc. (collectively Par), which manufactured the generic drugs at issue, alleging that the defendants engaged in a scheme to defraud insurers. This scheme, the Fund concludes, violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968. Finding that the complaint failed to state a claim upon which relief could be granted, the district court dismissed the case.

We affirm. While the complaint contains ample allegations of misconduct by both Walgreens and Par, it falls short of plausibly alleging the type of concerted activity undertaken on behalf of an identifiable enterprise necessary to a successful RICO claim. RICO is not violated every time two or more individuals commit one of the predicate crimes listed in the statute. In the end, that is all that this complaint alleges, and thus the action was properly dismissed.

**I**

As this case reaches us on appeal from a motion to dismiss, we accept all facts alleged in the complaint as

true. Par is the fifth-largest generic drug manufacturer in the United States. In the late 1990s it began to manufacture a generic version of the drug ranitidine, which is marketed under the brand name Zantac and which went off-patent in 1997. Although ranitidine is most commonly prescribed as either 150-mg or 300-mg tablets, Par (as well as several other manufacturers) manufactured ranitidine in capsule form. While tablets and capsules of a given drug contain the same active ingredient, the federal Food and Drug Administration (FDA) does not consider the different dosage forms to be "bioequivalent." (It has held this position since at least December 2000.) As a result, a prescription for ranitidine tablets may not be filled with ranitidine capsules (or vice versa) without authorization from the prescribing physician.

In the early 2000s Par began to market and distribute a generic version of fluoxetine, which is sold under the brand name Prozac and which went off-patent in 2001. Most fluoxetine is prescribed as 10-mg or 20-mg capsules; Par, however, had marketing and distribution rights to 10-mg and 20-mg fluoxetine tablets. As with ranitidine, prescriptions for fluoxetine capsules may not be filled with fluoxetine tablets in the absence of a physician's authorization.

Although Par's ranitidine capsules and fluoxetine tablets were considerably less popular than the alternative dosage forms, they had the potential to be much more lucrative. To understand why, a brief discussion of pharmacy reimbursement practices is in order. When a patient seeking to fill a prescription has insurance,

the pharmacy recoups most of the cost of filling that prescription from the insurer. The insurer could be the government, a private insurance company, or, as in this case, a welfare-benefit fund. Each insurer (or, more generically, Third-Party Payor (TPP)) establishes the rates at which it will reimburse the pharmacy. For generic drugs that are available from multiple sources (most of them), the reimbursement rate is calculated as a Maximum Allowable Cost, which represents the maximum amount that the TPP will reimburse the pharmacy for a given drug. Maximum Allowable Costs are set based on price information gathered in the marketplace. They reflect changing market conditions and bear a reasonable relation to drugs' actual costs. If, however, there are too few manufacturers of a given generic to determine a Maximum Allowable Cost, the reimbursement rate is set using an alternative measure: the Average Wholesale Price. Average Wholesale Prices are benchmark prices published by drug manufacturers; they often bear little to no relation to a drug's cost.

Unsurprisingly, TPP reimbursement rates are substantially higher when based on the Average Wholesale Price than when based on the Maximum Allowable Cost. A pharmacy makes more money on prescriptions reimbursed using Average Wholesale Prices, and this in turn enables the drug manufacturer to command higher prices for those drugs. Because so few manufacturers made either ranitidine capsules or fluoxetine tablets, reimbursement rates for those dosage forms of those drugs were calculated using the favorable Average Wholesale Price method. By contrast, the more popular

ranitidine tablets and fluoxetine capsules were reim-
bursed according to the Maximum Allowable Cost method.

Par, realizing that the disparity between reimburse-
ment formulas for the different dosage forms of ranitidine
and fluoxetine presented an opportunity for profit,
crafted a marketing pitch aimed at convincing pharmacies
to purchase the more expensive dosage forms of each
one. In presentations to pharmacies—including Walgreens,
but also others, such as Caremark and CVS—Par high-
lighted the millions of dollars in additional profits the
pharmacies stood to earn if they could find a way to fill
their ranitidine and fluoxetine prescriptions with dosage
forms reimbursed under the generous Average Wholesale
Price formula. These presentations implied (at the
least) that the pharmacies could legally fill prescriptions
written for one dosage form with an alternative dosage
form without seeking approval from the prescribing
physician, a suggestion that directly contravened the
FDA's position that the tablets and capsules are not
bioequivalent.

Par's pitch evidently worked on Walgreens. Beginning
in 2001, Walgreens reconfigured its internal computer
systems so that all prescriptions for ranitidine were
filled with capsules and all prescriptions for fluoxetine
were filled with tablets, regardless of the dosage form
actually prescribed. The Fund alleges that Walgreens's
pharmacists implemented this switch without con-
sulting the prescribing physicians. Worse, Walgreens's
director of pharmacy marketing, Tom Lawlor, falsely
represented in an email to company pharmacists that

Par's ranitidine capsules were "AB-rated generic prod-ucts" and thus could be substituted for ranitidine capsules under FDA regulations. Worse still, Walgreens continued its policy of automatically switching dosage forms even after receiving a rebuke from the Illinois Department of Public Health in July 2001, warning that the statement that ranitidine capsules were AB-rated generics was "false and deceptive."

Walgreens's dosage-form-switching practices eventu-ally attracted scrutiny from a number of states' attorneys general and the Justice Department. In September 2004, acting on the advice of counsel, Walgreens ended the switching program for all new prescriptions and resumed filling ranitidine and fluoxetine prescriptions with the dosage form specified by the physician. Walgreens con-tinued to fill existing prescriptions with the more ex-pensive dosage forms for some unspecified period of time. Lawlor explained in an email that this change in policy was implemented "quietly." In order to offset the revenue loss from the termination of the switching pro-gram, Walgreens negotiated with Par to receive price reductions on ranitidine and fluoxetine.

In 2008, at the request of the United States, the court unsealed a *qui tam* complaint against Walgreens. The complaint alleged that the switching program resulted in overcharges to the federal government and various states in violation of both the False Claims Act (FCA), 31 U.S.C. §§ 3729-3731, and related state laws. See Com-plaint, *United States ex rel. Lisitza v. Walgreens Co.*, No. 03-cv-00744 (N.D. Ill. Jan. 31, 2003). Walgreens paid

$35 million to the federal government, 46 states, and Puerto Rico to settle the claims. *Walgreens to Pay $35 Million to U.S., Forty-Six States & Puerto Rico to Settle Medicaid Prescription Drug Fraud Allegations*, DEP'T OF JUSTICE (June 4, 2008), http://www.justice.gov/opa/pr/2008/June/ 08-civ-496.html. In 2011, a similar *qui tam* complaint against Par was unsealed. See Second Amended Complaint, *United States ex rel. Lisitza v. Par Pharm. Co.*, No. 06-cv-06131 (N.D. Ill. July 19, 2011). That case is ongoing.

Relying largely on the pleadings and documents from the *qui tam* cases, the Fund filed this class action lawsuit in January 2012, alleging that Walgreens and Par conducted an association-in-fact RICO enterprise for the purpose of overcharging insurers by switching dosage forms of ranitidine and fluoxetine. Walgreens and Par moved to dismiss for failure to state a claim. The district court granted the motion after concluding, among other things, that the Fund failed to allege sufficiently that Walgreens and Par conducted the affairs of an enterprise within the meaning of 18 U.S.C. § 1962(c). The Fund appeals.

## II

The district court identified numerous deficiencies in the Fund's complaint, each of which would provide an independent basis for dismissal. We need not be so comprehensive. Because we agree with the district court that the complaint fails to allege that Walgreens and Par "conduct[ed]" the affairs of an "enterprise," 18 U.S.C.

§ 1962(c), we see no need to address the district court's alternative bases for dismissal.

We review *de novo* whether the Fund's enterprise allegations meet the pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure. *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 625 (7th Cir. 2007). To state a claim sufficient to survive a Rule 12(b)(6) motion to dismiss, the Fund's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plausibility" is not a synonym for "probability" in this context, but the plausibility standard does "ask[] for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; see also *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

A

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Critically for our purposes, to state a claim under this section, a plaintiff must identify an "enterprise." See, *e.g.*, *Slaney v. Int'l Amateur Athletic Ass'n*, 244 F.3d 580, 597 (7th Cir. 2001). The statute defines the term "enterprise" to include "any individual, partnership, corporation, association, or

other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has held on multiple occasions that this definition is to be interpreted broadly. See, *e.g.*, *Boyle v. United States*, 556 U.S. 938, 944 (2009); *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257 (1994). Most recently, it clarified in *Boyle* that an "association-in-fact" enterprise need not have any structural features beyond "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946.

Despite the expansive nature of this definition, it is not limitless. Section 1962(c) requires a plaintiff to identify a "person"—*i.e.*, the defendant—that is distinct from the RICO enterprise. See *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."); *Baker v. IPB, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004) ("Without a difference between the defendant and the 'enterprise' there can be no violation of RICO."). And that "person" must have "conducted or participated in the conduct of the '*enterprise's* affairs,' not just [its] own affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original); see also *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010); *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009). (Alleging a "pattern of racketeering activity" imposes further requirements still, though we

may set those aside, as we need not reach this aspect of the district court's decision.)

The Fund points to Walgreens and Par as the "persons" it has identified for purposes of RICO, and it defines the "enterprise" as an entity consisting of Walgreens, Par, and management personnel from the two companies. According to the complaint, the members of the enterprise associated for the common purpose of profiting from illegally substituting Par's more expensive dosage forms of ranitidine and fluoxetine for the cheaper dosage forms actually prescribed. The complaint further alleges that communications between the parties, as well as Walgreens's implementation of the illegal dosage-form-switching program using Par's pills, establishes relationships among the enterprise's members. The scheme's multiyear duration, it concludes, establishes longevity. The Fund asserts that the enterprise was known as "Walgreens/Par/Hrp" (also referred to as the "Hrp enterprise"). It supports this terminology based on Par's use of this label in a PowerPoint slide accompanying a presentation it made to Walgreens regarding ranitidine.

Before *Boyle*, we would have had little trouble concluding that these allegations were insufficient to plead the existence of an association-in-fact distinct from Walgreens and Par. See, *e.g.*, *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675-76 (7th Cir. 2000); *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645-46 (7th Cir. 1995). *Boyle*, however, took a liberal view of what it takes to be an association-in-fact for RICO purposes; it held that

such an association had to have certain structural features (a purpose, relationships among those associated with it, and adequate longevity), that the structure had to be ascertainable, but that no additional structural requirements could be inferred from the statute. Even if we were to assume, however, that the complaint sufficiently pleads the *existence* of an association-in-fact enterprise under *Boyle*, it does not adequately allege that Walgreens and Par were conducting the affairs of this "Hrp enterprise," as opposed to their own affairs. See *Reves*, 507 U.S. at 185. The Fund details various communications between Par and Walgreens in which Par proposed the drug-switching program and Walgreens agreed to implement it. It also describes actions taken by each company—namely, that Par manufactured the expensive dosage forms and that Walgreens rigged its internal computer systems automatically to switch all ranitidine and fluoxetine prescriptions to the expensive dosage forms. But nothing in the complaint reveals how one might infer that these communications or actions were undertaken on behalf of the *enterprise* as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests. The complaint does not allege, for instance, that officials from either company involved themselves in the affairs of the other. Par personnel were not responsible for reprogramming Walgreens's computer system, and Walgreens personnel were not involved in Par's manufacturing process. Nor does the complaint anywhere suggest that profits from the illegal drug-switching scheme were siphoned off to the Hrp enterprise or to individual enter-

prise members. And although it would be possible to envision a complaint that accused individual corporate personnel of improperly hijacking the business operations of their companies for illicit ends, see *Jay E. Hayden*, 610 F.3d at 389, the Fund does not assert this either. Instead, the activities the complaint describes are entirely consistent with Walgreens and Par each going about its own business, with Par manufacturing generic drugs and marketing its products to pharmacies, and Walgreens purchasing drugs and filling prescriptions.

To be sure, Walgreens and Par were not strangers. Representatives from the companies regularly communicated with one another, and Walgreens purchased its generic ranitidine and fluoxetine from Par. This type of interaction, however, shows only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes of improperly filling ranitidine and fluoxetine prescriptions. See *Crichton*, 576 F.3d at 399-400 (plaintiff could not show that defendant conducted the affairs of an association-in-fact enterprise by describing a "garden variety" marketing arrangement between defendant and its supposed partner in the enterprise). Although the Fund's allegations do not entirely rule out the inference that Walgreens and Par were acting in concert on behalf of a shadow enterprise while maintaining the outward appearance of a normal commercial relationship, there is ultimately not enough in this complaint to elevate that inference from a "sheer possibility" to something that is "plausible on its face." *Iqbal*, 556 U.S. at 678.

Nor does the fact that Walgreens's and Par's activities were by all appearances illegal indicate that the companies were acting on behalf of a distinct enterprise. *Cf. Baker*, 357 F.3d at 691 (plaintiffs failed adequately to allege that defendant was conducting the affairs of an enterprise when "[t]he nub of the complaint is that [the defendant] operates *itself* unlawfully") (emphasis in original). A corporation, after all, is perfectly capable of breaking the law on its own behalf. The complaint describes conduct that might plausibly state a claim for fraud (among other things) against either defendant, but RICO does not penalize parallel, uncoordinated fraud. Accord *Boyle*, 556 U.S. at 947 n.4 (RICO violation would not be established by a showing that various defendants engaged in RICO predicate crimes "independently and without coordination"). The Fund cannot bootstrap its allegations of illegal conduct into allegations that Walgreens and Par conducted the affairs of an enterprise by asking us to infer that because the activities were illegal, they therefore must also have been coordinated activity undertaken on behalf of the Hrp enterprise.

The Fund asks us to assume that Walgreens and Par were acting on behalf of the supposed Hrp enterprise "because neither Defendant could have accomplished the [drug-switching] scheme[] on its own." The Fund reasons that because Walgreens does not manufacture drugs and Par does not fill prescriptions, neither company could have implemented the drug-switching scheme without the other. (This assumes, perhaps optimistically, a dearth of other market actors who might have been tempted to earn extra money this way.) It relies on

the Third Circuit's decision in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010), for the proposition that "if defendants band together to commit [violations] they cannot accomplish alone . . . then they cumulatively are conducting the association-in-fact *enterprise's* affairs, and not [simply] their *own* affairs." *Id.* at 378 (alterations and emphases in original) (internal quotation marks omitted). The RICO allegations in *Insurance Brokerage* identified an association-in-fact enterprise consisting of an insurance broker and various insurers formed with the aim of reaping supracompetitive profits on insurance contracts through a system of bid rigging. *Id.* at 376. The district court expressed doubt that the defendants were participating in the affairs of an enterprise, as opposed to their own affairs, because "each entity was engaging in such transactions solely for the purpose of furthering its own goals*." In re Ins. Brokerage Antitrust Litig.*, 2007 WL 2892700, at *31 (D.N.J. Sept. 28, 2007). The Third Circuit saw things differently, concluding that regardless of whether "the interests of the enterprise are congruent with those of its members," one could infer that the defendants were acting on behalf of the enterprise from the fact that their bid-rigging practices "allowed them to deceive insurance purchasers in a way not likely without [] collusion." 618 F.3d at 378.

The Fund's reliance on *Insurance Brokerage* is inapt. For one thing, it is far from obvious that Walgreens could not have accomplished the drug-switching scheme on its own by simply purchasing expensive dosage forms from Par and other manufacturers (of which there were

apparently several) and filling prescriptions with these expensive dosage forms on its own initiative. Moreover, in *Insurance Brokerage*, the defendants could not have achieved their goals—namely, fixing a competitive bidding process in order to win insurance contracts at inflated prices—without cooperation that fell outside the bounds of the parties' normal commercial relationships. Companies competing for business in a legitimate market that assigns business through bidding do not disclose their bids to one another in advance. By contrast, while it is true that Walgreens does not make drugs and Par does not fill prescriptions, and that the two companies must therefore "cooperate" in order for drugs to reach consumers, such cooperation describes virtually every prescription pharmaceutical distribution chain. The allegations in the complaint do not indicate how the cooperation in this case exceeded that inherent in every commercial transaction between a drug manufacturer and pharmacy, and without such an indication, we cannot find a basis for inferring that Walgreens and Par were conducting the enterprise's affairs.

B

The Fund's failure adequately to allege that Walgreens and Par conducted the affairs of an enterprise is also fatal to its RICO conspiracy claim. Proof of a conspiracy within the scope of RICO requires a showing that: " '(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the

defendant further agreed that someone would commit at least two predicate acts to accomplish those goals.'" *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (quoting *Slaney*, 244 F.3d at 600); see 18 U.S.C. § 1962(d). Just as the complaint fails to allege that Walgreens and Par acted on behalf of the Hrp enterprise, it equally fails to allege that Walgreens and Par *agreed* to act on behalf of the enterprise. We have explained that "the touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998). Having failed to plead facts that would establish a violation of Section 1962(c), the Fund cannot state a claim for conspiracy under Section 1962(d) based on those same facts. See *Stachon*, 229 F.3d at 677.

The judgment of the district court is AFFIRMED.