PACIFIC HARBOR CAPITAL, INC., successor to Pacific Corp Credit, Inc., Plaintiff-Appellant,

v.

BARNETT BANK, N.A., Morton A. Goldberg, Defendant-Appellee.

No. 00-14405.

United States Court of Appeals,

Eleventh Circuit.

May 30, 2001.

Appeal from the United States District Court for the Middle District of Florida. (No. 97-00416-CV-FTM-29A), John E. Steele, Judge.

Before CARNES, COX and NOONAN[*], Circuit Judges.

NOONAN, Circuit Judge:

Pacific Harbor Capital, Inc., (PHC) appeals the judgment of the district court for the middle district of Florida holding on partial summary judgment that PHC's civil RICO suit against Barnett Bank, N.A. (Barnett) is barred by the statute of limitations. PHC's remaining state law claims were dismissed with prejudice pursuant to an agreement between the parties. The sole issue on appeal is whether partial summary judgment was justifiably given against PHC on its contention that the statute of limitations was equitably tolled. Guided by *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000), we affirm the judgment of the district court.

FACTS

For purposes of this appeal, we state undisputed facts and also facts alleged by PHC which we accept as true only to determine whether if true these facts prevent summary judgment for Barnett. Where a fact is noted as disputed, we take it here as PHC contends it to be.

PHC, the subsidiary of a power company, is a financial institution whose headquarters are in Portland, Oregon. In 1987 its interest in investments and the need of a Florida land developer, John Santini, led PHC to consider making a major investment in Lee County, Florida. Unfamiliar with the territory, PHC wanted local participation in the financing. Santini secured the cooperation of Barnett, a bank from which he had borrowed for other projects. Barnett agreed to participate in the amount of $2,500,000 and to act as PHC's disbursing agent.

---

[*]Honorable John T. Noonan, Jr., U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

PHC agreed to lend Santini's development company, Fiddlesticks, Ltd., $5,700,000, taking a mortgage on land to be developed by Fiddlesticks as an upscale residential community with a golf club available to members of the community. PHC also agreed to provide Fiddlesticks $4,300,000 as a construction loan. Barnett was to take a quarter share in this financing and, as disbursing agent for PHC, to certify for each disbursement under the construction loan that Santini was in compliance with the terms of that loan and with the terms of the mortgage loan and that no adverse financial changes had occurred in his creditworthiness or the collateral. It is a disputed fact whether from the start Santini was not creditworthy and known by Barnett to be in desperate financial need.

In making these arrangements, Harvey Goldberg of the Goldberg Law Firm in Fort Meyers represented both the developer, Santini, and the local lender, Barnett. Harvey's brother, Morton, was the president of the law firm and a director of Barnett. Unbeknownst to PHC at the time, Santini gave Harvey Goldberg a heavily discounted lot in the Fiddlesticks development. It is disputed whether Barnett knew of this transaction and whether the transaction influenced Barnett's behavior in relation to PHC.

The financing was to close August 19, 1987. On the day of the closing, Barnett declined to participate in the loan, giving as a reason that it had discovered a discrepancy in the loan papers as to the amount of "the release price" Barnett would receive on sale of a residential unit. It is disputed whether this reason was pretextual and whether Barnett withdrew because it believed PHC would go ahead and fund Santini anyway, as in fact PHC did. In early 1988, at PHC's insistence, Barnett participated in the Fiddlesticks financing in the amount of $1,000,000.

According to the loan agreement, Fiddlesticks was to use $4,400,000 of the mortgage to pay off an existing mortgage held by Goldome Federal Savings Bank (Goldome). By letter of August 11, 1987, eight days prior to the closing, Goldome informed the Goldberg law firm that it would accept $2,355,000 to release its mortgage. Joseph Barta, an employee of PHC, became aware of this difference of over $2,000,000 in the uses of the loan proceeds in late 1987 or early 1988. PHC made no objection, although it then knew that the loan proceeds had not and would not be disbursed in accordance with the loan agreement.

From September 1987 to October 1991, Barnett provided PHC with the monthly certificate required by Barnett's duties as disbursing agent. In all, Barnett provided 51 such certifications. It is PHC's position that each of these certificates was untruthful as to Santini's creditworthiness and stable financial condition. Many, if not all, of these certifications must have been untruthful as to the disbursements being made in accordance with the loan agreement. Not only was Goldome's mortgage paid off for less than planned,

$1,700,000 of the loan was diverted to other projects of Santini, a fact disclosed by Santini on August 2, 1991 and brought to PHC's attention in November or December 1991. As PHC also came to learn later, $50,000 of the loan proceeds were diverted to Harvey Goldberg and $50,000 to Morton Goldberg. Where the rest of the difference went between the money scheduled to pay off Goldome and the money actually paid to Goldome is not clear; but wherever it went, the disbursing agent could not have truthfully reported that the loan agreement was being followed.

On February 3, 1989, Fiddlesticks asked PHC for an advance from the construction loan to pay real estate taxes on the project. Barnett certified the use. PHC made the advance. In fact, as PHC learned in May 1990, the advance was used to pay taxes on a different project. Despite knowing of this diversion by Santini and of Barnett's inaccurate certification, PHC on June 5, 1990 amended and restated its financing agreement with Fiddlesticks. In the same month, Barnett loaned Santini $100,000 to pay tax delinquencies. The loan was not disclosed to PHC.

On October 1, 1990, Fiddlesticks defaulted and PHC declared the full amount due. PHC appointed Gerry McHale, an accountant and workout specialist, to see what could be done. On October 18, 1990, McHale met with Santini and with Harvey Goldberg, who came as the representative of Barnett. Although Barnett's representative, Goldberg answered No for Santini when PHC asked if it could have a second mortgage on the Enclave, another real estate development where Barnett held a first. Goldberg made the decision, and his "answer was so quick and firm that it certainly made one think there was a hidden agenda that had already been played out between Barnett Bank and the Santinis under which this scenario had been discussed." McHale noted that it appeared that Barnett had lied or misled PHC as to Barnett's relation as a lender to Santini. He also noted that Santini was represented by another director of the Barnett Bank.

On July 2, 1991, PHC foreclosed its mortgage and ultimately, on October 1, 1991, obtained a final judgment of $7,653,155. In September 1992, PHC sued Santini, Fiddlesticks, Harvey Goldberg and the Goldberg law firm, alleging conspiracy, fraud, professional negligence, breach of fiduciary relationship, breach of trust, and breach of contract in connection with the financing of Fiddlesticks; that case was settled in late 1994. Morton Goldberg in November 1995 pled guilty to federal charges of mail fraud and money laundering; some of the violations he admitted are, disputably, among the acts charged against Barnett in this suit.

On December 9, 1996, PHC and Barnett entered a tolling agreement by which they agreed that, if any applicable statute of limitations had not expired by December 9, 1996, it would be tolled until March 31,

1997.

## PROCEEDINGS

On February 14, 1997, PHC filed the present suit against Barnett in the district of Oregon; on August 28, 1997, the case was transferred to the middle district of Florida. The suit alleged violations by Barnett of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (RICO) and breaches of contract, breaches of fiduciary duty and common law fraud. Individual defendants associated with Barnett were also named but subsequently dismissed by PHC. Damages over $13 million were alleged.

On July 1, 1999, Barnett filed motions for summary judgment on all of PHC's claims; the motions were referred to Magistrate Judge Howard T. Snyder. On December 8, 1999, he filed a report noting many of the facts already recited and noting that PHC "knew it had sustained an injury" when Fiddlesticks defaulted in October 1990.

To these facts the magistrate judge applied the then current rule in the Eleventh Circuit that the statute of limitations on RICO claims begins to run only when the plaintiff not only knows or should have known of the existence and source of its injury but also knows or should have known the injury was "part of a pattern of racketeering." *Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc.,* 906 F.2d 1546, 1554-55 (11th Cir.1990). As the magistrate judge construed the tolling agreement between Barnett and PHC, PHC was barred if it had known, or should have known, of a RICO pattern before December 9, 1992. The magistrate judge held that PHC had not known and should not have known by this date and consequently was not barred.

Barnett objected to the report of the magistrate judge. Less than three months after the report was made, the United States Supreme Court decided *Rotella.* The district court recognized that *Rotella* altered the legal landscape and asked for briefing on *Rotella*'s impact on the case before it. On March 31, 2000, the district court upheld the magistrate-judge's conclusion that PHC's injury occurred in October 1990, applied *Rotella* to the undisputed facts of this case and held that PHC had notice of its injury within the limitations period. Summary judgment was entered against PHC on its RICO claims. On motion for reconsideration, the district court held that PHC had not shown that it "acted with reasonable diligence" to discover the RICO pattern. PHC's motion was denied.

PHC appeals.

## ANALYSIS

*The Statute of Limitations.* We assume, without needing to decide, that the statute of limitations period starts from the date of discovery of the injury. Under the injury discovery rule, unless tolled, the statute of limitations under RICO is four years from the date the plaintiff knew it was injured. *Rotella,* 528 U.S. 549, 552-53, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). PHC knew it was injured when Santini defaulted on October 1, 1990. Unless tolled, the statute of limitations barred a RICO suit by PHC after October 1, 1994. The December 9, 1996 tolling agreement referred to by the magistrate is irrelevant because the statute would have run by the time it was made.

*Facts First.* To recapitulate the relevant facts bearing on whether PHC knew or should have known of a RICO pattern before October 1, 1994: PHC knew that Barnett had pulled out of its original commitment to lend Santini $2,500,000 on grounds that, whether pretextual or not, would have justified PHC in calling off the deal; that one of the major purposes of PHC's mortgage loan had not been carried out because the full amount scheduled had not been needed and that at least $1,700,000 of it had been diverted to other Santini enterprises; that Barnett had not faithfully certified disbursements in accordance with its agency as the disbursing bank; that construction loan funds intended as payment for taxes on the project had been used to pay taxes on other projects; that Barnett had not only failed to be faithful as a disbursing agent but had failed to report the Santini financial difficulties that the diversions from the PHC financing signaled; that, after the Fiddlesticks' default, PHC's workout specialist had noted Barnett's lawyer speaking for Santini and had thought that a hidden agenda had been followed by the local bank with the local developer; that the fingerprints of the Goldberg firm were all over the financing of Santini and that, as the saying goes, the Goldbergs and Barnett were thick as thieves; and that PHC had a cause of action against Harvey Goldberg, the Goldberg firm, Santini, and several high executives of Barnett.

PHC discovered the pattern of RICO predicate acts only in 1995 when Morton Goldberg pled guilty to federal crimes and Barnett ceased to use Harvey Goldberg and the Goldberg law firm.

*Tolling.* A "pattern of predicate acts may well be complex, concealed, or fraudulent," *Rotella* observes and PHC argues here; but those characteristics of RICO predicates are not enough to toll the statute of limitations. *Rotella,* 528 U.S. at 556, 120 S.Ct. 1075, 145 L.Ed.2d 1047. A "considerable effort may be required before a RICO plaintiff can tell whether a pattern of racketeering is demonstrable." *Id.* Exactly our case, chimes in PHC. But the need for a considerable effort to break open the pattern does not place the RICO plaintiff "in a significantly different position from the malpractice victim" who seeks to sue for malpractice.

*Id.* The malpractice victim who knows he has been injured must promptly take steps to discover the pattern producing his injury; he cannot wait for events fortuitously to make clear to him that inadequate treatment was involved in his injury. *Id.* at 556, 120 S.Ct. 1075. The financial fraud victim is also not allowed to wait for time, the mother of truth, to make manifest a prohibited pattern. True, fraud by its nature means that the truth has been concealed. But "the occurrence of fraud in RICO patterns" is not a good reason to put off the running of the statute. *Id.* at 559-560, 120 S.Ct. 1075.

Equitable principles of tolling are not "unsettled" by *Rotella,* the opinion in its penultimate paragraph asserts. *Id.* at 560, 120 S.Ct. 1075. But "the very nature of such tolling" is that it be "the exception, not the rule." *Id.* at 561, 120 S.Ct. 1075. PHC has pointed to no facts that make its case exceptional. PHC does, for example, point to testimony by Santini that, in 1991 or 1992, he was given $5,000 in cash by Harvey Goldberg and, later $10,000 to $15,000 arranged by Harvey's brother, Morton, to "make this whole Pacific Harbor matter go away." If these bribes were offered, the Goldbergs and the Barnett Bank employing them were attempting to conceal the fraud. But we need not decide these disputed factual matters. Such attempts did not prevent PHC from knowing of Santini's 1991 admission of the large diversion of the loan funds; nor would such bribes have hidden from PHC the facts it already knew that put PHC on notice that it had been injured and that it had been injured by its disbursing agent, Barnett, acting in complicity with Santini and using a lawyer who acted for both Barnett and Santini.

Equitable tolling is defeated, even on summary judgment, when it is shown that indisputably the plaintiffs "had notice sufficient to prompt them to investigate and that, had they done so diligently, they would have discovered the basis for their claims." *Morton's Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823, 832 (11th Cir.1999); *Osterneck v. E.T. Barwick Industries, Inc.,* 825 F.2d 1521 (11th Cir.1987). It is true that under *Morton's Market,* a Clayton Act case, even "non-diligent" plaintiffs are protected if there is a "veil of fraudulent concealment." *Id.* at 832. The protection of the non-diligent plaintiff is not the rule in RICO cases. *Rotella,* 528 U.S. at 556-57, 120 S.Ct. 1075.

When, in September 1992, PHC sued Santini, Harvey Goldberg, the Goldberg law firm and the Barnett executives for fraud and conspiracy, PHC should have pressed harder, investigated more vigorously, drawn more inferences and reached the conclusion about Barnett which PHC arrived at tardily in 1995—that is, it should have reached this conclusion if its untried allegations now against Barnett are true. The reasons why PHC is held to this standard of diligence are the reasons of *Rotella.* First, the period of limitations

permitted by RICO's focus on predicate acts is long.  On PHC's theory that it could not have discovered the pattern until 1995, PHC could have brought this suit in 1999, twelve years after the first predicate act.  That is too long for a RICO suit to hang in the air.  *Rotella* at 555, 120 S.Ct. 1075.  Second, PHC as a RICO plaintiff was offered the reward of triple damages.  That reward was meant to stimulate its vigilance as a private attorney general.  *Id.* at 557-558, 120 S.Ct. 1075.  It was not eligible for the reward when it was not vigilant enough to get a full report from McHale on his inferences about Barnett;  it received his diary only in March 1997 although it was bound by all the knowledge he had in October 1990.  Third, the RICO statute of limitations is modeled on the Clayton Act. The corporations affected by violations of either law will typically face complex sets of facts requiring sustained legal analysis.  *Id.* at 557, 120 S.Ct. 1075.  The RICO plaintiff, like the Clayton Act plaintiff, is expected to promptly get the legal advice necessary to discern the wrong, if wrong there be.  PHC did not.  Without conceding liability under RICO, Barnett has executed the difficult but not impossible task of showing beyond dispute that, before October 1, 1994, PHC had such notice of possible wrongdoing by Barnett that diligent investigation would have furnished the information that justified the allegations of PHC's complaint of February 14, 1997, by which time the statute of limitations had expired.

For these reasons, the judgment of the district court is AFFIRMED.