FILED
United States Court of Appeals
Tenth Circuit

August 25, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROBERT L. KROENLEIN TRUST, by
and through Deborah Alden, Successor
Trustee; and CHUGWATER
BREWING COMPANY, INC. a
Wyoming corporation,

　　　　　Plaintiffs - Appellants,

v.

GARY BRUCE KIRCHHEFER;
COMMODORE BAR, INC.; RICK L.
BOWEN; SILVER DOLLAR BAR OF
LUSK, LLC, and LARRY R.
HALLIGAN,

　　　　　Defendants - Appellees.

No. 13-8040

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 2:11-CV-00284-SWS)**

Patrick J. Crank, Crank Legal Group, P.C., Cheyenne, Wyoming, for Appellants.

R. Todd Ingram (Scott J. Olheiser with him on the brief), Ingram Olheiser, P.C.,
Casper, Wyoming, for Appellees.

Before **TYMKOVICH**, **McKAY**, and **MATHESON**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

The Robert L. Kroenlein Trust owns and operates J&B Liquors, a business in Torrington, Wyoming. In 2005, a salesman for one of J&B's beer distributors, Gary Kirchhefer, began stealing beer from J&B's account and reselling the stolen beer to other bars and liquor stores in Wyoming, including those owned by the defendants. One of the owners of J&B discovered Kirchhefer's theft on August 31, 2007, and Kirchhefer was eventually prosecuted and convicted of the crime.

Seeking recovery of its losses, Kroenlein (we refer to J&B and its owners collectively as Kroenlein)[1] filed suit on August 15, 2011, against Kirchhefer, two of the bars to which he sold his ill-gotten beer, and the owners of the bars. The suit asserted several claims alleging that the defendants had violated the federal Racketeer Influenced and Corrupt Organization (RICO) statute, 18 U.S.C. §§ 1961–68. The defendants moved for summary judgment on several grounds, including that Kroenlein's RICO claims were barred by RICO's four-year statute of limitations. The district court granted summary judgment on the grounds that all of Kroenlein's RICO claims were time-barred. In the alternative, the district court also found that the undisputed evidence could not support Kroenlein's RICO claims because the defendants were not properly associated with a statutorily required enterprise under RICO.

---

[1] Deborah Alden, Robert Kroenlein's daughter, is the successor trustee of the Robert L. Kroenlein Trust, which owned and operated J&B as an asset of the Trust until the assets were distributed to Deborah and Eric Alden in January 2006. Deborah Alden and her husband, Eric Alden, own Chugwater Brewing Company, the entity that assumed ownership and operation of J&B in January 2006.

Because we agree Kroenlein's RICO claims are time-barred, we AFFIRM the district court's dismissal of Kroenlein's claims.

## I. Background

J&B Liquors is a bar and liquor store located in Torrington, Wyoming. Prior to his death in November 2004, Robert L. Kroenlein managed and operated J&B Liquors through the Kroenlein Trust. Following Mr. Kroenlein's death, his daughter, Deborah Alden, became the successor trustee.

After Mr. Kroenlein's death in 2004, Eric Alden, Deborah's husband, assumed the role of operator and manager of the store. At the time, Mr. Alden worked as the Platte County Attorney in Wheatland, Wyoming, a city located sixty miles away from Torrington. Both he and his wife lived in Wheatland until January 2007. Between 2004 and 2007, Margaret Hauf—the store manager during Kroenlein's tenure—ran the day-to-day operations of the store. During this time period, Mr. Alden would visit the store on the weekends and would call Hauf every morning to check in. In January 2007, the Aldens moved to Torrington and Mr. Alden began to manage J&B full time.

J&B stocked beer from several distributors. In particular, J&B purchased Anheuser Busch products from a local distributor, Orrison Distributing Company. Every Monday, an Orrison salesman would conduct a "presale" during which the salesman would inventory the beer in J&B's cooler, determine what Anheuser Busch products needed to be ordered, and put together an order for J&B. The

Orrison salesman would enter this order on a digital device and would later transmit the order to the Orrison warehouse in Cheyenne by plugging the device into a phone line.

The following day, Orrison deliverymen would drive to J&B, unload the beer from the truck and stack the beer in the alley behind J&B for shelving. Orrison would deliver the beer to J&B around 6:30 in the morning. Upon delivery, Hauf would only periodically confirm that the amount of beer on the invoice matched the amount of beer brought into the store. According to Mr. Alden, this inventory count was not consistently performed because Hauf was "busy doing other things" and she was the only employee who opened the store on Tuesdays. App. 1471. This perfunctory practice apparently was specific to beer deliveries, as another employee would open with Hauf on the days liquor was delivered to ensure an inventory count was done on each liquor delivery.

In 2005, Gary Kirchhefer, an Orrison salesman, began looting beer from J&B Liquors.[2] The intricacies of the scheme were not particularly complex. Kirchhefer would perform a presale at J&B on Monday. When he placed the order for J&B, he would order extra cases of beer on J&B's account—beer that

_____

[2] The complaint alleges that Kirchhefer began stealing from J&B in 2002, as does Kroenlein's brief on appeal. But Kirchhefer testified that he began stealing beer from J&B in 2005 and not earlier. *See* App. 1279. Based on our review of the record, we are unable to find any evidence indicating that Kirchhefer was involved in stealing from J&B prior to 2005, and we therefore assume for purposes of this appeal that Kirchhefer's theft began at the earliest in 2005.

J&B did not need, but that Kirchhefer intended to give away or sell to other bars. The next day, Kirchhefer would accompany the delivery truck to J&B, dismiss the driver, and stack most of the beer in J&B's cooler himself, save for the extra beer he intended to resell. Kirchhefer would then load the reserved extra beer into his own van and continue on to his next stop.

Although Kirchhefer testified that he sold or gave away the beer to several people, he mainly resold the stolen beer to the Silver Dollar Bar, owned by Larry Halligan, and the Commodore Bar, owned by Rick Bowen. Kirchhefer would sell Halligan and Bowen the beer at the discounted price of $10–$12 a case; in contrast, normal wholesale Orrison products retailed for $17–$18 per case. All three defendants agree that neither Halligan nor Bowen knew the beer was stolen from another customer.

All of this went on for at least two years, between 2005 and 2007. And the theft did not go unnoticed by J&B's accountants. Carol Clark, one of J&B's accountants, testified that she pointed out to Mr. Alden that J&B's beer purchases were exceeding beer sales as early as 2004, the year Robert Kroenlein died. Eric Alden believed that several factors could have contributed to J&B's beer losses, such as seasonal variations in purchases and sales, employee error, accounting error, employee theft, or theft by one of J&B's several beer distributors. Nevertheless, Mr. Alden testified that by the fall of 2005 he knew that there were significant discrepancies between "the statements, the invoices of Orrison, and the

beer sales from J&B" and "was aware of the fact that the problem was not easily explained just by seasonal discrepancies." App. 1502.[3] Although he had "subliminally known that there was something wrong with the numbers on beer sales and they didn't add up or look right," Mr. Alden only "began to take a hard look" at the problem in March 2007—several months after he moved to Torrington and began managing J&B full time. App. 1497. Mr. Alden was aware that, in each year beginning in 2005, J&B's income tax returns showed that J&B had purchased more beer than it sold in that year, but he merely "wondered about it" and did not start "checking invoices, receipts, visiting with employees or taking any active conduct to find out what was happening." App. 1561.

Mr. Alden finally took action when he performed the first inventory of the store on August 30 and 31, 2007. On August 30, after closing the store around midnight, he inventoried the amount of Orrison products in the store. The following day, after Kirchhefer had made his delivery, Mr. Alden repeated his

---

[3] Kroenlein argues that Mr. Alden was only aware of discrepancies in total beer sales and that the district court erred in noting that Mr. Alden was aware of the discrepancies between the Orrison invoices and beer sales. Clark testified that the profit and loss statements were "broken out by products" but only noted that the statements would include, for example, "beer purchased as opposed to beer sold." App. 345. And earlier in his deposition, Mr. Alden stated that the discrepancies were not just based on Orrison: "It wasn't just Orrison, because everything was lumped together as beer sales, beer purchases." App. 1501. But later in the deposition, Mr. Alden admitted that he was aware of discrepancies between Orrison invoices and J&B's sales: "Q: You became aware and noticed that there were discrepancies between the statements, the invoices of Orrison, and the beer sales from J&B; is that right? . . . A: Yes." App. 1502. The district court relied on the latter statement.

inventory of the store's Orrison products. He immediately discovered that there were significant discrepancies between the amount of beer ordered from Orrison and the quantity delivered. But Mr. Alden did not notify Orrison, the police, or any employees about the missing beer because he "wanted to find out what was happening" and "apprehend the thief." App. 1473–74.

Mr. Alden continued to take inventory of the storeroom before and after each Orrison delivery twice a week for two months. On September 17 and 18, 2007, he inventoried the Orrison products following a delivery by another Orrison employee, Todd Werner, which revealed no shortages. Mr. Alden testified that "it was then that I realized that the common denominator of the thefts was not only that they were all coming from Orrison, but also that they were all occurring only on the days that Mr. Kirchhefer was the one doing it." App. 1479. Mr. Alden still declined to contact law enforcement for fear of alerting the thief because he wanted to "get firm evidence of what was going on." App. 1480. Finally, in late October 2007, he installed a video surveillance camera at J&B. Video taken from the camera revealed Kirchhefer loading a portion of J&B's beer into his own van. Every video of Kirchhefer filmed after October 30, 2007, showed Kirchhefer's theft of the beer missing from the Orrison delivery.

In October 2007, Mr. Alden contacted law enforcement. Kirchhefer was eventually charged and pleaded guilty to theft. As part of his plea agreement,

-7-

Kirchhefer revealed in 2010 that he had sold the stolen beer to Halligan and Bowen.

On August 15, 2011, almost four years after Eric Alden took his first inventory of the store, Kroenlein filed a complaint against Kirchhefer, Bowen, Halligan, the Commodore Bar, and the Silver Dollar Bar, alleging eight causes of action. The complaint alleged two state law claims and six RICO claims—three violations of 18 U.S.C. §§ 1962(a),(c), and (d) by Kirchhefer, the Silver Dollar Bar, and Halligan, and three violations of the same statutory provisions by Kirchhefer, the Commodore Bar, and Bowen. According to the complaint, the defendants engaged in a pattern of racketeering activity by committing wire fraud in violation of 18 U.S.C. § 1343.

The district court granted summary judgment to the defendants on the grounds that all of Kroenlein's RICO claims were barred by the statute of limitations because the undisputed facts established (1) defendants did not fraudulently conceal Kroenlein's cause of action; and (2) Kroenlein was aware of its injury by the fall of 2005 and, had it exercised due diligence, would have known of the cause of action. The district court also found that the undisputed facts showed that no RICO "enterprise" existed among Kirchhefer, Bowen, and Halligan and, therefore, Kroenlein's RICO claims were barred on this alternative ground.

## II. Analysis

Kroenlein contends the district court erred in granting summary judgment on the grounds that Kroenlein's RICO claims were barred by the statute of limitations. Kroenlein argues there was no possibility that the Aldens could have been aware of their injury prior to August 31, 2007, and, alternatively, that the limitations period was equitably tolled by defendants' fraudulent concealment of the cause of action. Kroenlein also argues that the district court erred in finding as a matter of law that Kroenlein's RICO claims were barred because Kroenlein failed to establish the existence of a RICO enterprise.

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The statute of limitations is an affirmative defense, *see* Fed. R. Civ. P. 8(c); *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1303 (10th Cir. 2003), so the defendant, as the moving party, bears the burden of demonstrating that there is no material fact in dispute on the issue of whether the statute of limitations bars the claim. *See Prince v. Farmers Ins. Co.*, 982 F.2d 529 (10th Cir. 1992).

As we explain below, we agree with the district court's conclusion that Kroenlein's claims are barred by RICO's four-year statute of limitations because the Aldens knew or should have known of their injury before August 31, 2007, and that the limitations period was not tolled due to fraudulent concealment.

Because we affirm on this ground, we need not address the merits of Kroenlein's separate argument that a civil RICO enterprise existed.

## A. Civil RICO Statute of Limitations

RICO provides a private right of action in federal court for individuals injured in their business or property through fraudulent conduct. A RICO plaintiff must prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). "The term 'rackeetering activity' is defined to include a host of so-called predicate acts," *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008), including "any act which is indictable under . . . section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). It thus sweeps in a number of traditional common law fraud claims if the requisite pattern and entity requirements are met. The Mafia, of course, is the quintessential racketeering enterprise, but normal businesses can also fall under RICO's broad criminal and civil rubric.

Civil RICO damages claims are subject to a four-year statute of limitations. *Rotella v. Wood*, 528 U.S. 549, 552 (2000); *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). Barring actions after a fixed time, the Supreme Court has explained, serves the "basic policies of . . . repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella*, 528 U.S. at 555; *see also Gabelli v. SEC*, 133 S. Ct. 1216, 1221 (2013) ("Statutes of limitations are

intended to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." (citations and internal quotation marks omitted)). The civil RICO limitations provision is particularly significant in light of civil RICO's objective of "encouraging prompt litigation to combat racketeering." *Rotella*, 528 U.S. at 557 n.3.

Traditionally, a right "accrues"—starts the clock ticking on the limitations period—"when the plaintiff has a complete and present cause of action." *Gabelli*, 133 S. Ct. at 1222 (citations and internal quotation marks omitted); *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 610 (2013) ("As a general matter, a statute of limitations begins to run when the cause of action 'accrues'—that is, when the plaintiff can file suit and obtain relief." (citations and internal quotation marks omitted)); Black's Law Dictionary (9th ed. 2009) (defining "accrue" as "[t]o come into existence as an enforceable claim or right"). Under this rule, often called the "injury-occurrence rule," a claim would "accrue" when the injury occurs, even if undiscovered. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1969 n.4 (2014).

But exceptions exist to the injury-occurrence rule where the nature of the harm or the cause of the harm is difficult to detect. Think of medical malpractice claims as the paradigmatic example. Fraud is another example of such an exception. *See Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1794 (2010) ("[W]here

-11-

a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is *discovered*." (citations and internal quotation marks omitted)).  In these exceptional cases, courts apply an injury-discovery rule, which provides that the injury "is deemed to be discovered when, in the exercise of reasonable diligence, it could have been discovered."  *Id.* (citations and internal quotation marks omitted); *see also Gabelli*, 133 S.Ct. at 1222.

The rationale for the injury-discovery rule hinges on the deceptive nature of the injury.  Absent an exception to the general injury-occurrence accrual rule, a perpetrator's deceptive conduct could "prevent a plaintiff from even *knowing* that he or she has been defrauded" and produce the perverse result that "the law which was designed to prevent fraud could become the means by which it is made successful and secure."  *Id.* at 1221 (citations and internal quotation marks omitted).  But the Supreme Court has emphasized that, although the injury-discovery rule codifies the presumption that "equity tolls the statute of limitations in cases of fraud or concealment," it does not stand for the "general presumption [that the injury-discovery rule is] applicable across *all* contexts."  *TRW Inc. v. Andrews*, 534 U.S. 19, 27 (2001) (emphasis added).[4]

_____

[4] The Supreme Court has applied the injury-discovery rule in the limited context of latent disease and medical malpractice where "the cry for such a rule is loudest."  *TRW Inc.*, 534 U.S. at 27 (citations and internal quotation marks omitted) (noting that these are the "only other cases" where the Supreme Court

(continued...)

-12-

The RICO statute does not provide an accrual rule, and the Supreme Court has not weighed in definitively on the issue. But the Court has recognized that either the injury-discovery rule or the injury-occurrence rule will apply. *See Rotella*, 528 U.S. at 553–54; *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008). In *Rotella*, the Court emphasized that RICO was patterned on the Clayton Act, which employs the injury-occurrence rule, and that analogies between RICO and the Clayton Act are particularly apt because both statutes share the common provenance of "encouraging civil litigation to supplement Government efforts to deter and penalize the respectively prohibited practices." 528 U.S. at 557. The *Rotella* Court also rejected the notion that "the connection between civil RICO and fraud" necessarily justifies the adoption of an accrual rule specific to fraud. *Id.* at 557 ("Nor does Rotella's argument gain strength from the fact that some patterns of racketeering will include fraud, which is generally associated with a different accrual rule; we have already found the connection between civil RICO and fraud to be an insufficient ground for recognizing a limitations period beyond four years."). But even so, the Supreme Court explicitly refused to "settle upon a

[4](...continued)
has recognized a discovery rule). Thus, a tort victim's claim under these causes of action accrues at the time the plaintiff reasonably discovers or should have discovered his injury and its cause, not simply at the time of the plaintiff's injury regardless of its discovery. *United States v. Kubrick*, 444 U.S. 109, 120 (1979); *Urie v. Thompson*, 337 U.S. 163 (1949).

final rule," because the merits of the injury-occurrence rule had not been adequately presented to the Court. *Id.* at 554 n.2.

We have yet to adopt either an injury-discovery or injury-occurrence rule for a civil RICO claim in this circuit. *Dummar*, 543 F.3d at 621. But almost every other circuit currently applies some form of the injury-discovery rule to civil RICO claims.[5] Most of these courts have done so simply based on the principle that "[f]ederal courts . . . generally apply a discovery accrual rule when a statute is silent on the issue, as civil RICO is here," *Rotella*, 528 U.S. at 555, although the Supreme Court has expressly refused to adopt that view as its own. *See TRW Inc.*, 534 U.S. at 27.

While we have yet to adopt an accrual rule for civil RICO cases, we have applied the injury-discovery rule to claims brought under the Federal Tort Claims Act (FTCA) and medical malpractice cases. *Plaza Speedway v. United States*, 311 F.3d 1262, 1267 (10th Cir. 2002). But we apply the injury-discovery rule only in the "exceptional case" where a "reasonably diligent plaintiff could not

---

[5] *See, e.g.*, *Lares Grp. II v. Tobin*, 221 F.3d 41, 44–45 (1st Cir. 2000); *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013); *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 250 (3d Cir. 2001); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 220 (4th Cir. 1987); *Boulmay v. Rampart 920, Inc.*, 124 F. App'x 889, 891 (5th Cir. 2005); *Sims v. Ohio Cas. Ins. Co.*, 151 F. App'x 433, 435–36 (6th Cir. 2005); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386–87 (7th Cir. 2010); *Klehr v. A.O. Smith Corp.*, 87 F.3d 231, 238–39 (8th Cir. 1996), *aff'd*, 521 U.S. 179 (1997); *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001); *Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1251 (11th Cir. 2001); *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1489–90 (D.C. Cir. 1989).

immediately know of the injury and its cause." *Cannon v. United States*, 338 F.3d 1183, 1190 (10th Cir. 2003) (citing *Plaza Speedway*, 311 F.3d at 1268); *accord Bayless v. United States*, __ F.3d __, No. 12-4120, 2014 WL 1663082, at *6 (10th Cir. 2014); *Arvayo v. United States*, 766 F.2d 1416, 1421 (10th Cir. 1985).

And in applying the injury-discovery rule to these "exceptional cases," we have consistently emphasized that the rule only "'protects plaintiffs who are blamelessly unaware of their claim because the injury has not yet manifested itself or because the facts establishing a causal link between the injury and [the cause of the injury] are in the control of the tortfeasor or otherwise not evident.'" *Bayless*, 2014 WL 1663082, at *6 (quoting *Plaza Speedway*, 311 F.3d at 1267). Absent exceptional circumstances, the general injury-occurrence rule governs the statute of limitations for FTCA claims. *Id.* ("The general accrual rule for FTCA claims is the 'injury-occurrence rule,' where the tort claim accrues on the date of injury." (citations and internal quotation marks omitted)).

We need not decide in this case which accrual rule governs civil RICO claims because Kroenlein's claims are barred under either the injury-occurrence or the injury-discovery rule. Under the injury-occurrence rule, the RICO "injury" to Kroenlein's business occurred when Kirchhefer began stealing beer from J&B in 2005. Under the injury-discovery rule, Kroenlein's claims accrued when the Aldens knew or should have known of their injury. As we explain below, the

undisputed facts in this case show that, through the exercise of reasonable diligence, Kroenlein should have discovered Kirchhefer's theft within four years of September 2005, the point at which Eric Alden admitted he was aware of significant discrepancies between beer sales and purchases that were not due to seasonal variations. We therefore conclude that under either accrual rule, Kroenlein's civil RICO claims are time-barred.

## B. *Application of the Injury-Discovery Rule*

The district court found as a matter of law that Mr. Alden was aware of the injury to his business by 2005, and, had he and his wife exercised due diligence, he would have known of the cause of action before August 31, 2007. Kroenlein argues on appeal that the district court erred in failing to conclude that Mr. Alden was not aware of the injury until August 31, 2007, because Alden could not have reasonably discovered who was responsible for J&B's beer losses until that date.

### 1. *Defining a Civil RICO "Injury"*

Before applying the facts, Kroenlein asks us to resolve a threshold question: what is a civil RICO "injury"? Does it include merely discovery of the harm (the loss of beer), or discovery of the harm *plus* the source of the harm (who was causing the losses)?

Kroenlein argues that, under *Rotella*, the statute of limitations does not begin to run until the plaintiff discovers *who* inflicted the injury. Under this theory, the Aldens were not aware of the injury to their business until August 31,

-16-

2007, when Mr. Alden confirmed that Kirchhefer was stealing beer, or at latest December 2010, when they first discovered Halligan and Bowen's involvement in the scheme.

The Supreme Court defined a civil RICO "injury" as the "harm from the predicate acts" that constitute racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985) ("Given that 'racketeering activity' consists of no more and no less than commission of a predicate act, § 1961(1), we are initially doubtful about a requirement of a 'racketeering injury' separate from the harm from the predicate acts."). A RICO predicate act includes "any act which is indictable under . . . section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). According to the Court's logic in *Sedima*, then, discovery of an "injury" would require only knowledge of the harm resulting from the predicate act—here, accounting losses resulting from Kirchhefer's alleged wire fraud—not *who* has committed the harm.

*Rotella* further supports the notion that discovery of a RICO "injury" does not require a plaintiff to definitively determine who actually committed the predicate act to trigger the limitations period, so long as the plaintiff is aware of his injury. In that case, the Supreme Court specifically rejected the "injury pattern" discovery accrual rule that some circuits had adopted. Under the "injury pattern" rule, a civil RICO claim would accrue only when the plaintiff "discovers, or should discover, both an injury and a pattern of RICO activity." *Rotella*, 528

-17-

U.S. at 553. Courts applying the injury-pattern rule required discovery of the pattern of racketeering activity because a "pattern of racketeering activity" is a required element of § 1962(c)—the RICO subsection at issue in *Rotella*.[6] *See, e.g.*, *Granite Falls Bank v. Henrikson*, 924 F.2d 150, 154 (8th Cir. 1991), *overruled by Rotella*, 528 U.S. at 553; *Bath v. Bushkin, Gaims, Gaines & Jonas*, 913 F.2d 817, 820 (10th Cir. 1990), *overruled by Rotella*, 528 U.S. at 553.

But in *Rotella*, the Supreme Court explained that, to bring a civil RICO claim, the plaintiff need only have discovered the *injury*, not the other elements of the RICO claim:

> [I]n applying a discovery accrual rule, we have been at pains to explain that *discovery of the injury, not discovery of the other elements of a claim*, is what starts the clock. In the circumstance of medical malpractice, where the cry for a discovery rule is loudest, we have been emphatic that the justification for a discovery rule *does not extend beyond the injury*.

528 U.S. at 555 (emphases added). *Rotella* rejected the injury-pattern rule in part because of the Court's concern with lengthening the civil RICO limitations period. The Court found that such a rule would potentially allow "proof of a defendant's acts even more remote from time of trial and, hence, litigation even more at odds with the basic policies of all limitations provisions," *id.*, and would

---

[6] Violation of § 1962(c) requires proof of: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496.

"clash with the limitations imposed on Clayton Act suits" which the Court historically used to interpret RICO. *Id.* at 557.

*Rotella* therefore explains that a plaintiff need not know all the elements required to bring a legal claim under civil RICO to start the limitations period running. Thus, a RICO victim need not have actual knowledge of exactly who committed the RICO predicate act resulting in the injury for a civil RICO claim to accrue.[7]

Our interpretation of *Rotella* is supported by precedent. For example, in a recent case, we considered a RICO claim brought by a farmer against several defendants, one of whom supplied the farmer with farm buildings and one who supplied him with replacement parts. *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226 (10th Cir. 2006). In that case, one of the farmer's buildings collapsed in 1995 and was repaired with parts from a replacement parts company. Then, in 1999, another building collapsed, and, in 2001, the building that had been repaired in 1995 again collapsed. An investigation later showed the buildings

---

[7] Kroenlein argues that *Rotella*'s citation to an FTCA case, *United States v. Kubrick*, means that *Rotella* impliedly required that a plaintiff at least know "who has inflicted the injury." Aplt. Br. at 7. But *Rotella* merely cited *Kubrick* for the proposition that a plaintiff need not know all the elements of his claim for a claim to accrue. *Rotella*, 528 U.S. at 555–56. Knowledge of the perpetrator's identity was not at issue in either *Rotella* or *Kubrick*. What was at issue in *Kubrick* was whether a victim who knew both the injury and the *cause* of the injury—in that case, administration of a particular drug—had the facts necessary to trigger the accrual of a malpractice claim, even if the victim did not know that the administration of the drug was negligent.

were defectively designed. We found that the farmer's claim was barred by RICO's statute of limitations because the farmer was "aware of his injury no later than June 1999, when the second building collapsed," *id.* at 1234, irrespective of the confusion as to what the actual *source* of the injury was—defective design or defects in the replacement parts.

In this case, the injury from the alleged predicate act of wire fraud was J&B's accounting losses based on beer it paid for but never received. Kroenlein asks us to hold that the Aldens could only have discovered their injury once the losses were traced to a particular individual, Kirchhefer. Kroenlein claims that a plaintiff cannot be expected to file a lawsuit if he is unaware who actually injured him. We disagree. The point of the injury-discovery rule is to start the clock ticking on the period in which a reasonably diligent person would determine the essential elements of a claim; the rule does not obligate the victim to file suit at that moment. That is why in *Cory* we found the clock started ticking even though the victim did not definitively know the precise identity of those who caused his injury.

Here, once the Aldens were aware that one of several individuals—one of several beer distributors or an employee—could be the cause of their injury, they had four years to determine the proper person against whom to file suit. Contrary to Kroenlein's claims, the Aldens need not have definitely determined *which* individual of the many possible candidates was *in fact* responsible for their injury

-20-

*before* their claims could accrue. Rather, their RICO claim accrued once they became aware of the injury to their business—theft of J&B's beer.

But even if knowledge of the perpetrator's identity were required for a claim to accrue, the discovery rule does not excuse the Aldens from their duty to exercise reasonable diligence to determine the identity of the thief. "[T]o know you've been injured and make no effort to find out by whom is the very laxity that statutes of limitations are designed to penalize." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 676 (7th Cir. 2009). As we explain below, the Aldens did not exercise reasonable diligence to determine who was stealing from them once they were aware of the possibility of theft. Accordingly, regardless of the definition of a RICO "injury" we adopt, the injury-discovery rule bars Kroenlein's claims.

### 2. *The Injury-Discovery Rule Bars Kroenlein's Claims*

In applying the injury-discovery rule, we ask not only when a plaintiff actually discovers his injury, but also when a reasonably diligent plaintiff would have discovered the injury. *Rotella*, 528 U.S. at 552–53. The second prong is an objective inquiry. *See Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001); *Forbes v. Eagleson*, 228 F.3d 471, 484 (3d Cir. 2000); *see also Arvayo*, 766 F.2d at 1422. The limitations period generally will not begin to run until the plaintiff either has actual or inquiry notice of the injury. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012).

"[A] plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable [plaintiff] of ordinary intelligence, through the exercise of reasonable due diligence, to discover his or her injury." *Mathews*, 260 F.3d at 251 & n.15; *see also Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998) (noting that the limitations period in securities fraud actions begins to run "once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud"). The plaintiff need not discover *all* elements of the fraudulent scheme to be on notice of the potential of fraud. *See Ebrahimi v. E.F. Hutton & Co.*, 852 F.2d 516, 523 (10th Cir. 1988) ("Inquiry notice is triggered by evidence of the *possibility* of fraud; it does not require full exposition of the fraud itself." (emphasis added) (citations omitted)).

Once a plaintiff has inquiry notice of facts that would suggest to a reasonable person that he has been injured, the plaintiff has a duty to commence a diligent investigation concerning that injury. *See Dodds v. Cigna Sec.*, 12 F.3d 346, 350 (2d Cir. 1993) ("[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." (citations and internal quotation marks omitted)); *see also Arvayo*, 766 F.2d at 1421–22 ("[O]nce the plaintiff [is] informed as to the probable connection between his [injury] and [its cause]," the burden is on the plaintiff to "discover not only whether [defendants] breached a duty to him, but

-22-

also to discover in the first instance whether there was a causal connection between their actions, or inactions, and his injury." (citations omitted)). If a RICO plaintiff "does begin or has begun to inquire once the duty arises," we must determine "when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence, and the statute of limitations begins to run on that date." *Koch*, 699 F.3d at 153. But when a RICO plaintiff "makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." *Id.* (citations and internal quotation marks omitted).

The undisputed facts show that, if the Aldens had been reasonably diligent, they would have discovered their injury before August 31, 2007. By the fall of 2005, Mr. Alden was aware that there were significant discrepancies between "the statements, the invoices of Orrison, and the beer sales from J&B" that were not "easily explained just by seasonal discrepancies." App. 1502. He also admitted that, before March 2007, he "had sort of subliminally known that there was something wrong with the numbers on beer sales and they didn't add up or look right, but in 2007, [he] began to take a hard look at it." App. 1497.

A reasonable person in Mr. Alden's position, knowing by the fall of 2005 that the losses were not due to seasonal variations and there was a possibility of distributor theft, would have made *some* inquiry into the cause of the losses. But the undisputed facts show that Mr. Alden did not exercise reasonable due diligence into the cause of J&B's beer losses. Rather, he "wondered about it"

until March 2007, App. 1561, and only began to inventory the beer in the store on August 30, 2007. By September 10, 2007 (the third inventory he performed), he "had stopped inventorying Coors products, because they never came up short, and I realized that my thefts were occurring from Orrison products." App. 1476–77. By his own admission, then, eleven days and two inventory counts were all it took to reveal that the losses were due to Orrison deliveries and not to theft by other distributors, employee error, or accounting error. If some inquiry is made after being put on inquiry notice, we will impute knowledge of what a person "in the exercise of reasonable diligence should have discovered." *Koch*, 699 F.3d at 151 (citations and internal quotation marks omitted). The undisputed evidence here shows that reasonable diligence would have quickly revealed that the beer losses were due to theft by an Orrison employee. Reasonable jurors could not disagree that it would have been feasible to complete such an investigation well within four years.

Kroenlein maintains that it was impossible for Mr. Alden to have discovered Kirchhefer's theft because he was basically an "absentee landlord" between 2004 and 2007 and his involvement in J&B's operation was a "very hit or miss proposition." Aplt. Br. at 11.[8] Kroenlein argues that it was only possible

---

[8] Kroenlein maintains that living in Wheatland, sixty miles away, would also have prevented Mrs. Alden from taking an inventory because of her schedule. The record does not clearly indicate whether Mrs. Alden was employed full-time during 2004 to 2007, although Kroenlein indicated at oral argument that she, too,
(continued...)

for Mr. Alden to "creep around the store after the store had closed at midnight and inventory the beer products located in his store" once he had moved to Torrington; otherwise, Mr. Alden would have had to "miss two days of work" to conduct such an inventory. Aplt. Br. at 11, 17. But the fact that the Aldens lived somewhere else does not affect our determination of what is objectively reasonable. What is more, Kroenlein offers no explanation why Mr. Alden was unable to take an inventory of the store until almost eight months after he moved to Torrington. The standard is an objective one, and a reasonable business owner equipped with the knowledge of loss would undertake an investigation to determine the cause of loss instead of waiting almost two years to take any action at all. *See Mathews*, 260 F.3d at 252 ("It is enough that a reasonable [plaintiff] of ordinary intelligence would have discovered the information and recognized it" as an indication of potentially fraudulent activity); *see also Arvayo*, 766 F.3d at 1422 ("[T]he question whether the Arvayos were 'reasonably diligent' [in inquiring into the cause and source of their injury] is of course an objective one.").

In sum, we agree with the district court that Kroenlein's claims are barred by civil RICO's four-year statute of limitations.

_____

[8](...continued)
was employed full-time during that period.

### C. *Fraudulent Concealment*

Kroenlein also argues that the district court erred in finding that it could not establish all the elements of fraudulent concealment.  Kroenlein contends that even if the four-year clock has run, the law allows the limitations period to be equitably tolled where a defendant has fraudulently concealed or prevented the plaintiff  from knowing an element of his cause of action.

Equitable tolling for fraudulent concealment requires "(1) the use of fraudulent means by the party who raises the ban of the statute; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action." *Dummar*, 543 F.3d at 621 (citations omitted).  The plaintiff must show that the defendant prevented him from "knowing [an] element of his RICO claim." *Id.* at 622.

The district court assumed the first two elements of equitable tolling were met but found that the undisputed evidence "fails to support that by the exercise of due diligence Plaintiff could not have known a cause of action may have existed." *Robert L. Kroenlein Trust ex rel. Alden*, No. 11-CV-284-S, 2013 WL 1337385, at *7 (D. Wyo. Mar. 31, 2013).

Kroenlein did not plead allegations of fraudulent concealment in its complaint, but even if it had, it would have been futile.  As we stated above, neither Mrs. nor Mr. Alden conducted any inquiry during the first two years after

the fall of 2005 when Mr. Alden was on notice that he could have potentially been defrauded. Had either of them or one of their employees conducted a minimal investigation, they would quickly have discovered that Kirchhefer's theft was the source of their losses. Kroenlein claims that Kirchhefer stacked the beer in the cooler in such a way as to make it more difficult to inventory it. But the Aldens or one of their employees could easily have inventoried the beer in other ways that would have revealed the scam.

A plaintiff must exercise due diligence to discover the fraud even if the defendant is actively attempting to conceal it. There is no genuine issue of material fact that Kroenlein did not exercise due diligence in this case.

## III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.